## CHAS. WOLFF PACKING COMPANY *v.* COURT OF INDUSTRIAL RELATIONS OF THE STATE OF KANSAS.

ERROR TO THE SUPREME COURT OF THE STATE OF KANSAS.

No. 739. Argued April 27, 1923.—Decided June 11, 1923.

1. Legislative authority to abridge freedom of contract can be justified only by exceptional circumstances, and the restraint must not be arbitrary or unreasonable. P. 533.
2. Businesses said to be clothed with a public interest justifying some public regulation, may be divided into three classes:
(*a*) Those which are carried on under authority of a public grant of privileges expressly or impliedly imposing the affirmative duty of rendering public service demanded by any member of the public,— e. g., the business of a common carrier, or a public utility.
(*b*) Certain occupations, regarded as exceptional, the public interest attaching to which, recognized from earliest times, has survived the period of arbitrary regulation of all trades and callings by Parliament or Colonial legislatures,—e. g., inns, cabs, and grist mills.
(*c*) Other businesses which have come to have such a peculiar relation to the public that government regulation has been superimposed upon them,—where the owner, by devoting his business to the public use, in effect grants the public an interest in that use, and subjects himself to regulation to the extent of such interest. P. 535.

3. A declaration by a legislature that a business has become affected by a public interest is not conclusive of the question whether attempted regulation on that ground is justified. P. 536.

4. In the present day one does not devote one's property or business to public use, or clothe it with a public interest, merely by making commodities for, and selling them to, the public, in the common callings. P. 537.

5. The option to deal or abstain from dealing, usually distinguishes private from quasi-public occupations. P. 537.

6. Whether the public has become so peculiarly dependent on a particular business that the owner, by engaging therein, subjects himself to intimate public regulation, must be determined upon the facts of each case. P. 538.

7. The extent to which a business which has become " clothed with a public interest " may be regulated depends upon the nature of the business, its relation to the public and the abuses reasonably to be feared. P. 539.

8. Assuming that the business of manufacturing and preparing food for human consumption may be put in the third class of quasi-public businesses noted above,—par. 2(c)—the Industrial Relations Act of Kansas, in seeking, as a measure for protection of public peace, health and general welfare, to enforce continuity and efficiency of the business by compelling employer and employees to submit controversies over wages to state arbitration, and in requiring the employer to pay the wages so fixed (even if confiscatory), and in forbidding the employee to join in strikes against them,— exceèds the limit of permissible regulation and deprives the employer of property, and both employer and employee of liberty, without due process of law, in violation of the Fourteenth Amendment. P. 540.

9. Public regulation can secure continuity in a business against owner and employee only when the obligation of continued service is direct and is assumed when the business is entered upon. Pp. 541, 543.

10. Where the theory and purpose of a statute depend upon compulsion of both employer and employee, its effect upon the employee may be considered when its constitutionality is attacked by an employer. P. 541.

11. The compulsory arbitration attempted under the Kansas statute in this case was not justifiable on the ground of temporary emergency. P. 542. *Wilson* v. *New,* 243 U. S. 332, distinguished.

111 Kans. 501, reversed.

This case involves the validity of the Court of Industrial Relations Act of Kansas. Chapter 29, Special Session, Laws of 1920. The act declares the following to be affected with a public interest: First, manufacture and preparation of food for human consumption; second, manufacture of clothing for human wear; third, production of any substance in common use for fuel; fourth, transportation of the foregoing; fifth, public utilities and common carriers. The act vests an Industrial Court of three judges with power upon its own initiative or on complaint to summon the parties and hear any dispute over wages or other terms of employment in any such industry, and if it shall find the peace and health of the public imperiled by such controversy, it is required to make findings and fix the wages and other terms for the future conduct of the industry. After sixty days, either party may ask for a readjustment and then the order is to continue in effect for such reasonable time as the court shall fix, or until changed by agreement of the parties. The Supreme Court of the State may review such orders and in case of disobedience to an order that court may be appealed to for enforcement.

The Charles Wolff Packing Company, the plaintiff in error, is a corporation of Kansas engaged in slaughtering hogs and cattle and preparing the meat for sale and shipment. It has $600,000 capital stock and total annual sales of $7,000,000. More than half its products are sold beyond the State. It has three hundred employees. There are many other packing houses in Kansas, of greater capacity. This is considered a small one.

In January, 1921, the .president and secretary of the Meat Cutters Union filed a complaint with the Industrial Court against the Packing Company respecting the wages its employees were receiving. The Company appeared and answered and a hearing was had. The court made findings, including one of an emergency, and an order as

to wages, increasing them over the figures to which the Company had recently reduced them. The Company refused to comply with the order and the Industrial Court then instituted mandamus proceedings in the Supreme Court to compel compliance. That court appointed a commissioner to consider the record, to take additional evidence and report his conclusions. He found that the Company had lost $100,000 the previous year, and that there was no sufficient evidence of an emergency or danger to the public from the controversy to justify action by the Industrial Court. The Supreme Court overruled his report and held that the evidence showed a sufficient emergency.

The prescribed schedule of wages and the limitation of hours and the rate of pay required for overtime resulted in an increase in wages of more than $400 a week.

It appeared from the evidence that the Company and plant were under the control of, and in business association with, what were called "The Allied Packers," who have plants in various cities and compete with the so-called Big Five Packers, the largest in the country, that the products of the Wolff Packing Company are sold in active competition with such products made by other concerns throughout the United States. It appeared further that about the time of this controversy, a strike was threatened in the packing houses of the Big Five which the President of the United States used his good offices to settle. The chief executive of the Wolff Company testified that there had been no difficulty in securing all the labor it desired at the reduced rates offered. The Industrial Court conceded that the Wolff Company could not operate on the schedule fixed without a loss, but relied on the statement by its president that he hoped for more prosperous times.

The Packing Company brings this case here on the ground that the validity of the Industrial Court Act was

upheld although challenged as in conflict with the provision of the Fourteenth Amendment that no State shall deprive any person of liberty or property without due process of law.

*Mr. D. R. Hite* and *Mr. John S. Dean,* with whom *Mr. Harry W. Colmery* was on the briefs, for plaintiff in error.

*Mr. John G. Egan* and *Mr. Chester I. Long,* with whom *Mr. Charles B. Griffith,* Attorney General of the State of Kansas, *Mr. Randal C. Harvey* and *Mr. Austin M. Cowan* were on the briefs, for defendant in error.

The State's power extends to the promotion of public convenience or general prosperity,—to so dealing with the conditions which exist in the State as to bring out of them the greatest welfare of its people. *Bacon* v. *Walker,* 204 U. S. 311.

A decision of the highest court of the State, declaring a use to be public in its nature, will be accepted by this Court, unless clearly not well founded. *Jones* v. *Portland,* 245 U. S. 217; *Green* v. *Frazier,* 253 U. S. 233.

It has been held by this Court that a state statute is valid which permitted the condemnation of land for the construction of an irrigation ditch to supply water for the uses of one person, *Clark* v. *Nash,* 198 U. S. 361; and that a State may authorize a condemnation of a right of way for an aerial or bucket line to serve in the operation of a gold mine. *Strickland* v. *Highland Boy Gold Mining Co.,* 200 U. S. 527. See *Mount Vernon-Woodberry Cotton Duck Co.* v. *Alabama Interstate Power Co.,* 240 U. S. 32.

The fire insurance business may be regulated as affected with a public interest. *German Alliance Insurance Co.* v. *Lewis,* 233 U. S. 389; *La Tourette* v. *McMaster,* 248 U. S. 465. And so may the banking business. *Noble State Bank* v. *Haskell,* 219 U. S. 104. The charges of a public stockyards company may be regulated. *Cotting* v. *Godard,* 183 U. S. 79.

In *Jones* v. *Portland, supra,* this Court held that the business of furnishing fuel to the citizens of Portland, Maine, was a public use, and that it was within the province of the State to provide by statute for the establishment of municipal fuel yards. In *Green* v. *Frazier,* 253 U. S. 233, it was held within the province of the State to engage in the business of dealing in foodstuffs and providing aid to citizens to build houses.

Phenomenal developments of the past fifty years have completely changed the customs, practices and manner of living of the American people. The meat industry has been completely revolutionized. The business of killing the live stock and of manufacturing the carcass into food for human consumption has been highly specialized and centralized and is controlled by a few great corporations employing hundreds of thousands of workmen operating in the great commercial centers and shipping their food products all over this country and to foreign countries. Many millions of our people are wholly dependent upon the continuous and efficient operation of the packing industry for their daily ration of meat. Millions of live-stock growers are dependent upon the continuous and efficient operation of the same industry for a market for their live stock. All this has impressed with a public interest the packing industry.

Much space is spent in the printed argument of opposing counsel on the constitutionality of the act so far as it affects the milling industry and the clothing industry. Neither of those questions is here for decision. The only question which this Court will determine is the constitutionality of the act as applied to this plaintiff in error. The Industrial Court Act is not open to attack in this case upon grounds which might possibly arise, but which do not affect the party questioning its constitutionality. *Arizona Employers' Liability Cases,* 250 U. S. 400.

The packing industry is affected with a public interest. It has been made the subject of congressional action, as

evidenced by the Packers and Stockyards Act of 1921.
*Stafford* v. *Wallace,* 258 U. S. 495.

The packing industry being affected with a public interest, it is therefore subject to regulation by the State.
*Munn* v. *Illinois,* 94 U. S. 113. It is argued, however, by the Packing Company that its plant is comparatively small and does not stand at the gateway of commerce, as the warehouses did in the *Munn Case.* That, however, is an old contention which has been met by this Court and overruled. *Brass* v. *North Dakota,* 153 U. S. 391.

The power to regulate an industry is not dependent upon its size.

The history of the packing industry shows that in 1886 and 1904 there were serious strikes, attended by disturbances of the peace, loss of life and shortage in meat production. There have been for years frequent labor controversies and disturbances in that business.

The order of the Industrial Court was but temporary, made to meet an emergency, and did not run as long as did the rates provided in the Adamson Law, (*Wilson* v. *New,* 243 U. S. 332,) which were for a period of six to eleven months. This Court has frequently held that a test should be made to ascertain whether or not an order made fixing rates is confiscatory.

In the compulsory insurance cases the working conditions of strictly private industries were regulated, and the employer was obliged to add, to the wages paid, the insurance premium paid on each employee necessary to provide compensation for the injured employee—and this regardless of the question of negligence. *Mountain Timber Co.* v. *Washington,* 243 U. S. 219; *Thornton* v. *Duffy,* 254 U. S. 361. In the workmen's compensation cases, *Arizona Employers' Liability Cases, supra,* the State by law added, to the cost of labor paid by the manufacturer, compensation for injuries occurring without fault of the employer, which had theretofore been borne by the em-

ployees. Thus the wages paid were in fact increased by legislative act. What had theretofore been borne by the workmen out of their wages was passed to the employer, to be paid by him in addition to the other wages paid. If the legislature can increase the cost of labor to the manufacturer by making him bear the cost of injuries arising out of accidents, then why. cannot the State under similar circumstances raise wages of employees slightly in the face of an emergency?

The Packing Company insists that under the doctrine of *Brooks-Scanlon Co.* v. *Railroad Commission,* 251 U. S. 396, the operation of a public utility cannot be compelled at a loss. That is correct. The order in this case does not require appellant to operate. The Packing Company can cease to operate if it does so in good faith and not for the purpose of evading the orders of the Industrial Court. That is recognized in the law itself. It can also reduce the number of employees which it hires, if it does so in good faith and not for the purpose of evading an order entered pursuant to the act.

It has been repeatedly recognized by this Court that the State has an interest in the working conditions and hours of labor in mills and manufacturing establishments and dangerous industries. The packing industry is both a dangerous industry and a manufacturing establishment. The power of the Government to prevent strikes dangerous to public peace and welfare has been recognized. *In re Debs,* 158 U. S. 564; *Wilson* v. *New,* 243 U. S. 332; *United States* v. *Railway Employees' Dept., A. F. L.,* 283 Fed. 479. That States have this power must be conceded. It must therefore be admitted that a State has the power to do that which is necessary to make effective its exercise of authority in this respect. *Chicago, Burlington & Quincy R. R. Co.* v. *McGuire,* 219 U. S. 549.

It would be futile to give the Industrial Court authority to settle industrial disputes and not give it the

power to prescribe a temporary minimum wage. It would likewise be futile to give to the Industrial Court the power to prescribe hours of labor and a minimum wage scale, if the company could make the award ineffective by reducing the number of hours of employment to a nominal amount each month.

In *Wilson* v. *New,* 243 U. S. 332, the majority opinion recognized that the Adamson Act amounted to compulsory arbitration, which Congress had the authority to enact.

The Supreme Court of Kansas has determined that an emergency existed in the present case. That determination must stand ,unless palpably wrong. In the emergency rent cases it was recognized that the legislative branch of government had the power to regulate a business in order to tide over a public emergency. *Block* v. *Hirsh,* 256 U. S. 135; *Marcus Brown Holding Co.* v. *Feldman,* 256 U. S. 170; *Levy Leasing Co.* v. *Siegel,* 258 U. S. 242.

The burden was upon the Packing Company to establish that the order of the Industrial Court was confiscatory. The bare presentation. of evidence showing deficits in operation is not proof of confiscation.

The order of the Industrial Court, if a proper exercise of the police power over a business affected with a public interest, does not become unconstitutional by virtue of any loss of profits to the Packing Company. On this phase of the case the Packing Company's contention amounts to this: if a business is not making a profit the State is deprived of the power to regulate it in the interest of the public health, the public morals, the public safety, the public peace, and the public welfare. We do not understand such to be the effect of the decisions of this Court. The same contentions have been raised as to every regulation made under the police power since the enactment of the Fourteenth Amendment. *Mugler* v. *Kansas,*

123 U. S. 623; *California Reduction Co.* v. *Sanitary Reduction Works,* 199 U. S. 306; *Hadacheck* v. *Los Angeles,* 239 U. S. 394.

Financial impossibility does not violate the Fourteenth Amendment, if the act and order in question are otherwise a proper exercise of the police power of the State. *Hebe Co.* v. *Shaw,* 248 U. S. 297.

The police power " is a continuing one, and a business lawful today may in the future, because of the changed situation, the growth of population, or other causes, become a menace to the public health and welfare, and be required to yield to the public good." *Dobbins* v. *Los Angeles,* 195 U. S. 223; *Pierce Oil Corporation* v. *Hope,* 248 U. S. 498.

Within the doctrine of *Noble State Bank* v. *Haskell,* 219 U. S. 104, the increase was so slight and the advantage to the public and the Packing Company so great in improving the working conditions and the efficiency of its employees, that the taking, if any, did not fall within the Fourteenth Amendment. We insist, however, that in the proper exercise of the police power, a State is not limited in its application to such industries or concerns as are making a profit. The law cannot be made applicable to those concerns which are making a profit, and inapplicable to those who are losing. *Arizona Employers' Liability Cases,* 250 U. S. 400; *German Alliance Ins. Co.* v. *Lewis,* 233 U. S. 389; *Powell* v. *Pennsylvania,* 127 U. S. 678; *Murphy* v. *California,* 225 U. S. 623; *Reinman* v. *Little Rock,* 237 U. S. 171.

The Packing Company objects to the act because it is claimed it does not affect employers and their employees alike. " To complain of a ruling, one must be made a victim of it." *Lehon* v. *Atlanta,* 242 U. S. 53.

The classification specified in the Industrial Court Act, § 30, is reasonable and proper.

The question for determination in this case is whether or not the legislative action has a reasonable relation to

the governmental authority to further public health, public morals, public safety, public peace, public convenience and the public general prosperity. If it has, the doctrine of freedom of contract cannot make the act unconstitutional. *Prudential Ins. Co.* v. *Cheek,* 259 U. S. 530; *Chicago, Burlington & Quincy R. R. Co.* v. *McGuire,* 219 U. S. 549.

The employer has no vested right in the conditions which obtained at the common law and prior to the enactment of the statute. In *Wilson* v. *New,* 243 U. S. 332, freedom of contract with reference to wages was taken away from the railroads in an emergency. Freedom of contract as to wages has also yielded to state action in those matters held not to be against the governmental power, but in aid thereof, and as to which the Government could act, such as: Measuring coal before screening, so as better to fix the miners' wages, *McLean* v. *Arkansas,* 211 U. S. 539; *Rail & River Coal Co.* v. *Yaple,* 236 U. S. 338; redeeming in cash store-orders issued for wages, *Knoxville Iron Co.* v. *Harbison,* 183 U. S. 13; paying employees in cash at certain rates when they are discharged, *St. Louis, etc. Ry. Co.* v. *Paul,* 173 U. S. 404; *Keokee Co.* v. *Taylor,* 234 U. S. 224, and at all times as often as twice a month, *Erie R. R. Co.* v. *Williams,* 233 U. S. 685, and in quantity rates as coal is screened, instead of weight before screening, or weight as ascertained in some other way, *McLean* v. *Arkansas,* 211 U. S. 539; *Schmidinger* v. *Chicago,* 226 U. S. 578; *Rail & River Coal Co.* v. *Yaple,* 236 U. S. 338; barring a railway in a personal injury suit from pleading as a defense the receipt of some fraternal benefit, *Chicago, Burlington & Quincy R. R. Co.* v. *McGuire,* 219 U. S. 549, and by adding to the cost of manufacturing in addition to wages, compensation to the employees for injuries occurring in the course of employment, without regard to the question of negligence, *Arizona Employers' Liability Cases,* 250 U. S. 400; *Mountain Timber Co.* v.

*Washington,* 243 U. S. 219; *Thornton* v. *Duffy,* 254 U. S. 361.

Freedom of contract as to hours and conditions of labor has had to yield to the governmental power where the police power has prescribed: Eight-hour day as basic day, with overtime thereafter, *Wilson* v. *New,* 243 U. S. 332; ten-hour day in mills, factories and manufacturing establishments, and time and a half for overtime, *Bunting* v. *Oregon,* 243 U. S. 426; sixteen hours continuous service on railroads, *Baltimore & Ohio R. R. Co.* v. *Interstate Commerce Comm.,* 221 U. S. 612; *Missouri, Kansas & Texas Ry. Co.* v. *United States,* 231 U. S. 112; eight hours per day in mines and smelters, *Holden* v. *Hardy,* 169 U. S. 366; maximum hours for labor for women, *Muller* v. *Oregon,* 208 U. S. 412; *Bosley* v. *McLaughlin,* 236 U. S. 385; *Miller* v. *Wilson,* 236 U. S. 373; *Riley* v. *Massachusetts,* 232 U. S. 671; eight-hour day on public work, *Atkin* v. *Kansas,* 191 U. S. 207; liability for injury under workmen's compensation act, regardless of question of negligence, *Arizona Employers' Liability Cases,* 250 U. S. 400; *New York Central R. R. Co.* v. *White,* 243 U. S. 188; *Same* v. *Bianc,* 250 U. S. 596; the time and place of paying seaman's wages, *The Bark Eudora,* 190 U. S. 169.

This yielding freedom of contract as to working conditions is also exemplified in the various factory acts and safety appliance laws which have been sustained, but as to which citation of authority is unnecessary.

MR. CHIEF JUSTICE TAFT, after stating the case as above, delivered the opinion of the Court.

The necessary postulate of the Industrial Court Act is that the State, representing the people, is so much interested in their peace, health and comfort that it may compel those engaged in the manufacture of food, and clothing, and the production of fuel, whether owners or

workers, to continue in their business and employment on terms fixed by an agency of the State if they can not agree. Under the construction adopted by the State Supreme Court the act gives the Industrial Court authority to permit the owner or employer to go out of the business, if he shows that he can only continue on the terms fixed at such heavy loss that collapse will follow; but this privilege under the circumstances is generally illusory. *Block* v. *Hirsh,* 256 U. S. 135, 157. A laborer dissatisfied with his wages is permitted to quit, but he may not agree with his fellows to quit or combine with others to induce them to quit.

These qualifications do not change the essence of the act. It curtails the right of the employer on the one hand, and of the employee on the other, to contract about his affairs. This is part of the liberty of the individual protected by the guaranty of the due process clause of the Fourteenth Amendment. *Meyer* v. *Nebraska, ante,* 390. While there is no such thing as absolute freedom of contract and it is subject to a variety of restraints, they must not be arbitrary or unreasonable. Freedom is the general rule, and restraint the exception. The legislative authority to abridge can be justified only by exceptional circumstances. *Adkins* v. *Children's Hospital,* 261 U. S. 525.

It is argued for the State that such exceptional circumstances exist in the present case and that the act is neither arbitrary nor unreasonable. Counsel maintain:

First. The act declares that the preparation of human food is affected by a public interest and the power of the legislature so to declare and then to regulate the business is established in *Munn* v. *Illinois,* 94 U. S. 113; *Budd* v. *New York,* 143 U. S. 517; *Brass* v. *Stoeser,* 153 U. S. 391; *Noble State Bank* v. *Haskell,* 219 U. S. 104; *German Alliance Insurance Co.* v. *Lewis,* 233 U. S. 389; and *Block* v. *Hirsh,* 256 U. S. 135.

Second. The power to regulate a business affected with a public interest extends to fixing wages and terms of employment to secure continuity of operation. *Wilson* v. *New,* 243 U. S. 332, 352, 353.

Businesses said to be clothed with a public interest justifying some public regulation may be divided into three classes:

(1) Those which are carried on under the authority of a public grant of privileges which either expressly or impliedly imposes the affirmative duty of rendering a public service demanded by any member of the public. Such are the railroads, other common carriers and public utilities.

(2) Certain occupations, regarded as exceptional, the public interest attaching to which, recognized ˙ from earliest times, has survived the period of arbitrary laws by Parliament or Colonial legislatures for regulating all trades and callings. Such are those of the keepers of inns, cabs and grist mills. *State* v. *Edwards,* 86 Me. 102; *Terminal Taxicab Co.* v. *District of Columbia,* 241 U. S. 252, 254.

(3) Businesses which though not public at their inception may be fairly said to have risen to be such and have become subject in consequence to some government regulation. They have come to hold such a peculiar relation to the public that this is superimposed upon them. In the language of the cases, the owner by devoting his business to the public use, in effect grants the public an interest in that use and subjects himself to public regulation to the extent of that interest although the property continues to belong to its private owner and to be entitled to protection accordingly. *Munn* v. *Illinois,* 94 U. S. 113; *Spring Valley Water Works* v. *Schottler,* 110 U. S. 347; *Budd* v. *New York,* 117 N. Y. 1, 27; s. c. 143 U. S. 517; *Brass* v. *Stoeser,* 153 U. S. 391; *Noble State Bank* v. *Haskell,* 219 U. S. 104; *German Alliance Insurance Co.*

v. *Lewis,* 233 U. S. 389; *Van Dyke* v. *Geary,* 244 U. S. 39, 47; *Block* v. *Hirsh,* 256 U. S. 135.

It is manifest from an examination of the cases cited under the third head that the mere declaration by a legislature that a business is affected with a public interest is not conclusive of the question whether its attempted regulation on that ground is justified. The circumstances of its alleged change from the status of a private business and its freedom from regulation into one in which the public have come to have an interest are always a subject of judicial inquiry.

In a sense, the public is concerned about all lawful business because it contributes to the prosperity and well being of the people. The public may suffer from high prices or strikes in many trades, but the expression " clothed with a public interest," as applied to a business, means more than that the public welfare is affected by continuity or by the price at which a commodity is sold or a service rendered. The circumstances which clothe a particular kind of business with a public interest, in the sense of *Munn* v. *Illinois* and the other cases, must be such as to create a peculiarly close relation between the public and those engaged in it, and raise implications of an affirmative obligation on their part to be reasonable in dealing with the public.

It is urged upon us that the declaration of the legislature that the business of food preparation is affected with a public interest and devoted to a public use should be most persuasive with the Court and that nothing but the clearest reason to the contrary will prevail with the Court to hold otherwise. To this point, counsel for the State cite *Clark* v. *Nash,* 198 U. S. 361; *Strickley* v. *Highland Boy Gold Mining Co.,* 200 U. S. 527; *Hairston* v. *Danville & Western Ry. Co.,* 208 U. S. 598, 600; *Union Lime Co.* v. *Chicago & Northwestern Ry. Co.,* 233 U. S. 211; *Jones* v. *Portland,* 245 U. S. 217, and *Green* v.

*Frazier,* 253 U. S. 233.    These cases are not especially helpful in determining how a business must be devoted to a public use to clothe it with a public interest so as to permit regulation of rates or prices.    They were of two classes, one where condemnation proceedings were opposed on the ground that private property could only be taken for a public use and the use contemplated by the legislature was not a public one.    The other was of tax suits in which the validity of the tax was denied because the use for which the tax was levied was not a public one. " Public use " in such cases would seem to be a term of wider scope than where it is used to describe that which clothes property or business " with a public interest." In the former, the private owner is fully compensated for his property.    In the latter, the use for which the tax is laid may be any purpose in which the State may engage, and this covers almost any private business if the legislature thinks the State's engagement in it will help the general public and is willing to pay the cost of the plant and incur the expense of operation.

It has never been supposed, since the adoption of the Constitution, that the business of the butcher, or the baker, the tailor, the wood chopper, the mining operator or the miner was clothed with such a public interest that the price of his product or his wages could be fixed by State regulation.    It is true that in the days of the early common law an omnipotent Parliament did regulate prices and wages as it chose, and occasionally a Colonial legislature sought to exercise the same power; but nowadays one does not devote one's property or business to the public use or clothe it with a public interest merely because one makes commodities for, and sells to, the public in the common callings of which those above mentioned are instances.

An ordinary producer, manufacturer or shopkeeper may sell or not sell as he likes, *United States* v. *Trans-Missouri*

*Freight Association,* 166 U. S. 290, 320; *Terminal Taxicab Co.* v. *District of Columbia,* 241 U. S. 252, 256, and while this feature does not necessarily exclude businesses from the class clothed with a public interest, *German Alliance Insurance Co.* v. *Lewis,* 233 U. S. 389, it usually distinguishes private from quasi-public occupations.

In nearly all the businesses included under the third head above, the thing which gave the public interest was the indispensable nature of the service and the exorbitant charges and arbitrary control to which the public might be subjected without regulation.

In the preparation of food, the changed conditions have greatly increased the capacity for treating the raw product and transferred the work from the shop with few employees to the great plant with many. Such regulation of it as there has been, has been directed toward the health of the workers in congested masses, or has consisted of inspection and supervision with a view to the health of the public. But never has regulation of food preparation been extended to fixing wages or the prices to the public, as in the cases cited above where fear of monopoly prompted, and was held to justify, regulation of rates. There is no monopoly in the preparation of foods. The prices charged by plaintiff in error are, it is conceded, fixed by competition throughout the country at large. Food is now produced in greater volume and variety than ever before. Given uninterrupted interstate commerce, the sources of the food supply in Kansas are countrywide, a short supply is not likely, and the danger from local monopolistic control less than ever.

It is very difficult under the cases to lay down a working rule by which readily to determine when a business has become " clothed with a public interest." All business is subject to some kinds of public regulation; but when the public becomes so peculiarly dependent upon a particular business that .one engaging therein subjects

himself to a more intimate public regulation is only to be determined by the process of exclusion and inclusion and to gradual establishment of a line of distinction.   We are relieved from considering and deciding definitely whether preparation of food should be put in the third class of quasi-public businesses, noted above, because even so, the valid regulation to which it might be subjected as such, could not include what this act attempts.

To say that a business is clothed with a public interest, is not to determine what regulation may be permissible in view of the private rights of the owner.   The extent to which an inn or a cab system may be regulated may differ widely from that allowable as to a railroad or other common carrier.   It is not a matter of legislative discretion solely.   It depends on the nature of the business, on the feature which touches the public, and on the abuses reasonably to be feared.   To say that a business is clothed with a public interest is not to import that the public may take over its entire management and run it at the expense of the owner.   The extent to which regulation may reasonably go varies with different kinds of business.   The regulation of rates to avoid monopoly is one thing.   The regulation of wages is another.   A business may be of such character that only the first is permissible, while another may involve such a possible danger of monopoly on the one hand, and such disaster from stoppage on the other, that both come within the public concern and power of regulation.

If, as, in effect, contended by counsel for the State, the common callings are clothed with a public interest by a mere legislative declaration, which necessarily authorizes full and comprehensive regulation within legislative discretion, there must be a revolution in the relation of government to general business.   This will be running the public interest argument into the ground, to use a phrase of Mr. Justice Bradley when characterizing a similarly

extreme contention. *Civil Rights Cases,* 109 U. S. 3, 24. It will be impossible to reconcile such result with the freedom of contract and of labor secured by the Fourteenth Amendment.

This brings us to the nature and purpose of the regulation under the Industrial Court Act. The avowed object is continuity of food, clothing and fuel supply. By § 6 reasonable continuity and efficiency of the industries specified are declared to be necessary for the public peace, health and general welfare, and all are forbidden to hinder, limit or suspend them. Section 7 gives the Industrial Court power, in case of controversy between employers and workers which may endanger the continuity or efficiency of service, to bring the employer and employees before it and, after hearing and investigation, to fix the terms and conditions between them. The employer is bound by this act to pay the wages fixed and, while the worker is not required to work, at the wages fixed, he is forbidden, on penalty of fine or imprisonment, to strike against them, and thus is compelled to give up that means of putting himself on an equality with his employer which action in concert with his fellows gives him.

There is no authority of this Court to sustain such exercise of power in respect to those kinds of business affected with a public interest by a change *in pais,* first fully recognized by this Court in *Munn* v. *Illinois, supra,* where it said (p. 126):

" Property does become clothed with a public interest when used in a manner to make it of public consequence, and affect the community at large. When, therefore, one devotes his property to a use in which the public has an interest, he, in effect, grants to the public an interest in that use, and must submit to be controlled by the public for the common good, the extent of the interest he has thus created. *He may withdraw his grant by discon-*

*tinuing the use; but so long as he maintains the use, he must submit to the control."*

These words refute the view that public regulation in such cases can secure continuity of a business against the owner. The theory is that of revocable grant only. *Weems Steamboat Co.* v. *People's Steamboat Co.,* 214 U. S. 345. If that be so with the owner and employer, *a fortiori* must it be so with the employee. In involves a more drastic exercise of control to impose limitations of continuity growing out of the public character of the business upon the employee than upon the employer; and without saying that such limitations upon both may not be sometimes justified, it must be where the obligation to the public of continuous service is direct, clear and mandatory and arises as a contractual condition express or implied of entering the business either as owner or worker. It can only arise when investment by the owner and entering the employment by the worker create a conventional relation to the public somewhat equivalent to the appointment of officers and the enlistment of soldiers and sailors in military service.

We are considering the validity of the act as compelling the employer to pay the adjudged wages, and as forbidding the employees to combine against working and receiving them. The penalties of the act are directed against effort of either side to interfere with the settlement by arbitration. Without this joint compulsion, the whole theory and purpose of the act would fail. The State can not be heard to say, therefore, that upon complaint of the employer, the effect upon the employee should not be a factor in our judgment.

Justification for such regulation is said to be found in *Wilson* v. *New,* 243 U. S. 332. It was there held that in a nation-wide dispute over wages between railroad companies and their train operatives, with a general strike, commercial paralysis and grave loss and suffering over-

hanging the country, Congress had power to prescribe wages not confiscatory, but obligatory on both for a reasonable time to enable them to agree. The Court said that the business of common carriers by rail was in one aspect a public business because of the interest of society in its continued operation and rightful conduct and that this gave rise to a public right of regulation to the full extent necessary to secure and protect it; that viewed as an act fixing wages it was an essential regulation for protection of public right, that it did not invade the private right of the carriers because their property and business were subject to the power of government to insure fit relief by appropriate means and it did not invade private rights of employees since their right to demand wages and to leave the employment individually or in concert was subject to limitation by Congress because in a public business which Congress might regulate under the commerce power.

It is urged that, under this act, the exercise of the power of compulsory arbitration rests upon the existence of a temporary emergency as in *Wilson* v. *New.* If that is a real factor here as in *Wilson* v. *New,* and in *Block* v. *Hirsh,* 256 U. S. 135, 157 (see *Pennsylvania Coal Co.* v. *Mahon,* 260 U. S. 393), it is enough to say that the great temporary public exigencies recognized by all and declared by Congress, were very different from that upon which the control under this act is asserted. Here it is said to be the danger that a strike in one establishment may spread to all the other similar establishments of the State and country and thence to all the national sources of food supply so as to produce a shortage. Whether such danger exists has not been determined by the legislature but is determined under the law by a subordinate agency and on its findings and prophecy, owners and employers are to be deprived of freedom of contract and workers of a most important element of their freedom of labor.

The small extent of the injury to the food supply of Kansas to be inflicted by a strike and suspension of this packing company's plant is shown in the language of the Kansas Supreme Court in this case (*Court of Industrial Relations* v. *Packing Co.*, 111 Kans. 501):

" The defendant's plant is a small one, and it may be admitted that, if it should cease to operate, the effect on the supply of meat and food in this State would not greatly inconvenience the people of Kansas; yet the plant manufactures food products and supplies meat to a part of the people of this State, and, if it should cease to operate, that source of supply would be cut off."

The Supreme Court's construction of the operation and effect of the act is controlling.   The language quoted shows how drastic and all-inclusive it is.

But the chief and conclusive distinction between *Wilson* v. *New* and the case before us is that already referred to.   The power of a legislature to compel continuity in a business can only arise where the obligation of continued service by the owner and its employees is direct and is assumed when the business is entered upon.   A common carrier which accepts a railroad franchise is not free to withdraw the use of that which it has granted to the public.   It is true that if operation is impossible without continuous loss, *Brooks-Scanlon Co.* v. *Railroad Commission,* 251 U. S. 396; *Bullock* v. *Railroad Commission,* 254 U. S. 513, it may give up its franchise and enterprise, but short of this, it must continue.   Not so the owner when by mere changed conditions his business becomes clothed with a public interest.   He may stop at will whether the business be losing or profitable.

The minutely detailed government supervision, including that of their relations to their employees, to which the railroads of the country have been gradually subjected by Congress through its power over interstate commerce, furnishes no precedent for regulation of the business of

the plaintiff in error whose classification as public is at
the best doubtful. It is not too much to say that the
ruling in *Wilson* v. *New* went to the border line, although
it concerned an interstate common carrier in the presence
of a nation-wide emergency and the possibility of great
disaster. Certainly there is nothing to justify extending
the drastic regulation sustained in that exceptional case
to the one before us.

We think the Industrial Court Act, in so far as it per-
mits the fixing of wages in plaintiff in error's packing
house, is in conflict with the Fourteenth Amendment and
deprives it of its property and liberty of contract with-
out due process of law.

The judgment of the court below must be

*Reversed.*