No. 24,174.

THE STATE OF KANSAS, *Appellee,* v. ALEXANDER HOWAT et al. (AUGUST DORCHY, *Appellant*).

### SYLLABUS BY THE COURT.

CRIMINAL LAW—*Statutes—Section 19 of the Court of Industrial Relations Act Regarded as an Independent Statute, for the Violation of Which Punishment May Be Inflicted—Other Sections of the Act Being Held Invalid Does Not Affect the Validity of Section 19.* By virtue of interpretative section 28 of the act creating the court of industrial relations (R. S. 44-628), section 19 (R. S. 44-619) is so far severable from the scheme of the legislation that it may stand alone, dissociated from the provisions relating to fixing wages, and is to be regarded as having the legal effect of an independent statute, making it a punishable offense for an officer of a labor union, acting in his official capacity, to call a strike of coal miners, whereby operation of a coal mine, in the production of coal, is suspended.

Appeal from Cherokee district court; FRANK W. BOSS, judge. Opinion filed July 5, 1924. Reaffirmed.

*Phil H. Callery, James E. Callery,* both of Pittsburg, and *Redmond S. Brennan,* of Kansas City, Mo., for the appellant.

*Charles B. Griffith,* attorney-general, *John G. Egan,* assistant attorney-general, *Chester I. Long, Austin M. Cowan,* and *William E. Stanley,* all of Wichita, for the appellee.

The opinion of the court was delivered by

BURCH, J.: Defendant was convicted of violating section 19 of the act creating the court of industrial relations (Laws 1920, ch. 29, R. S. 44-619). The section reads as follows:

"Any officer of any corporation engaged in any of the industries, employments, utilities or common carriers herein named and specified, or any officer of any labor union or association of persons engaged as workers in any

such industry, employment, utility or common carrier, or any employer of labor, coming within the provisions of this act, who shall willfully use the power, authority or influence incident to his official position, or to his position as an employer of others, and by such means shall intentionally influence, impel or compel any other person to violate any of the provisions of this act, or any valid order of said court of industrial relations, shall be deemed guilty of a felony, and upon conviction thereof in any court of competent jurisdiction shall be punished by a fine not to exceed $5,000, or by imprisonment in the state penitentiary at hard labor for a term not to exceed two years, or by both such fine and imprisonment."

The industry described in the information was coal mining. The labor union was district No. 14, United Mine Workers of America. Alexander Howat was president and August Dorchy was vice president of the union. The charge was that Howat and Dorchy used their official positions to induce miners in the coal mine known as Mine H, operated by the George K. Mackie Fuel Company, to cease work, for the purpose and with the effect of suspending continuous operation of the mine for production of coal for use in Kansas. Reduced to plain terms, Howat and Dorchy, as officers of the union, called a strike of union miners of the fuel company's mine, an unlawful act within contemplation of section 19.

The verdict of the jury in Dorchy's case reads as follows:

"We, the jury, duly empaneled and sworn to try the issues joined in the above-entitled cause, do on our oaths find the defendant, August Dorchy, guilty of a misdemeanor, in that said defendant did willfully hinder, delay, limit and suspend the operation of coal mine H of the George K. Mackie Fuel Company, in violation of chapter 29 of the Laws of Kansas of the Special Session 1920; committed all in manner and form as charged in the information in this case."

Judgment was entered on the verdict, that defendant should pay a fine of $500, serve six months' imprisonment in the county jail, and pay costs of the prosecution. Defendant appealed to this court, and the judgment was affirmed. (*The State v. Dorchy,* 112 Kan. 235, 210 Pac. 352.) The case was taken by writ of error to the supreme court of the United States, which reversed the judgment of this court, in order that this court may determine whether section 19 of the act is so far severable from the general scheme of the legislation that it may stand alone, dissociated from the provisions held unconstitutional in *Wolff Co. v. Industrial Court,* 262 U. S. 522. (*Dorchy v. Kansas,* 264 U. S. 286.)

Section 28 of the act reads as follows:

"If any section or provision of this act shall be found invalid by any court,

it shall be conclusively presumed that this act would have been passed by the legislature without such invalid section or provision, and the act as a whole shall not be declared invalid by reason of the fact that one or more sections or provisions may be found to be invalid by any court." (R. S. 44-628.)

In the case of *The State, ex rel., v. Howat,* 109 Kan. 376, 198 Pac. 686, the court said:

"Understanding the pioneer character of its work, the legislature framed the statute so that any invalid provision—not section [only], but provision (section 28)—may be eliminated without affecting others. This rule of interpretation extends to application of the same provision to different subjects." (p. 416.)

This rule was applied expressly in the case of *The State, ex rel., v. Howat,* 107 Kan. 423, 191 Pac. 585, and was tacitly applied in the case of *Court of Industrial Relations v. Packing Co.,* 114 Kan. 487, 219 Pac. 259. A writ of error to reverse the judgment in Howat's case was dismissed by the supreme court of the United States in *Howat v. Kansas,* 258 U. S. 181.

In the case of *The State, ex rel., v. Howat,* 109 Kan. 376, 198 Pac. 686, the court said:

"In dealing with the subject of the constitutionality of the legislation of 1920, the court can render no service by veiling the harshness of reality. The court of industrial relations is justified by facts, or is not justified at all, and it will be necessary to present a few disagreeable facts which lie naked to astonished gaze in our industrial history." (p. 395.)

Then followed exemplification of an appalling strike record in this state and elsewhere in the United States, including an account of the calling of the strike for which Dorchy was convicted in the case under consideration. When that strike was called, Howat and Dorchy were not employees of the George K. Mackie Fuel Company; the boy Mishmash, for whose benefit the strike was called, had not been employed by the fuel company for a year and a half; and no employee of the fuel company had any grievance whatever against his employer. The strike was called because Howat did not recognize courts. The exemplification referred to concluded as follows:

"Under these circumstances, on January 5, 1920, the legislature met in special session at the call of Governor Allen, to consider what it might do to protect the people of the state of Kansas from dislocations in production and distribution of the necessaries of life. The result of its deliberations was the act creating the court of industrial relations." (p. 402.)

In the proclamation calling the special session the governor said:

"An extraordinary occasion has arisen in the history of our state: A nation-

wide strike of coal miners in the bituminous coal fields began on November 1, 1919, and has constantly continued. We were at the mercy of a fuel famine. The emergency in Kansas was so poignant that it became necessary for the state to take over the mines and call for volunteer workers to produce coal for the needs of the people.

.   .   .   .   .   .   .   .   .   .   .   .   .   .

"It would be the most ironical episode in the history of the world if the freest government on earth should allow itself to be trapped into a condition where all of its functions waited upon the quarrel between the owners of some essential industry and its employees, while the people froze, starved, or went naked because the natural avenues of production were stopped by a ruthless quarrel, in the making of which the people had no part." (Senate Journal, Special Session 1920, pp. 1, 2.)

In his message to the special session of the legislature the governor said:

"An extraordinary need for additional legislation was revealed during the last two months, by a most daring attempt to override government and make the public the helpless victim of a fuel famine. With a heartlessness that has no parallel in the history of the industrial quarrel, the public was told that while the controversy over a wage scale was going on between capital and labor, it could freeze.   .   .   .

"Both parties to the quarrel had supplied themselves with sufficient coal to keep themselves from freezing, and the attitude to the public was of that callous indifference which has become familiar to the public.   .   .   .

"There is no reason why government should not have the same power to protect society against the ruthless offenses of industrial strife as it has always had to protect it against recognized crime.   .   .   ." (Senate Journal, Special Session 1920, pp. 5, 6, 7.)

The court of industrial relations act undertook to provide a method of settling industrial disputes in essential industries, by a scheme which the supreme court of the United States miscalls compulsory arbitration. Justice was to be done between employer and employee, but protection of the public interest was to be paramount, and the public interest is not a subject of arbitration. Besides that, the constitution and functions of the tribunal forbade its classification as an arbitral body.

It is doubtful if the legislature seriously believed its declaration that the clothing industry was affected with a public interest would stand, or that, under any foreseeable circumstances, that industry could become affected with a public interest. The legislature did know that strikes in the coal mines closed public institutions, stopped public and private business, caused suffering in homes, and threatened death to patients in hospitals. In addition to providing

a method of settling disputes affecting production of coal, striking and picketing were dealt with in sections 17 and 18. The right of any individual worker, however, to leave his employment at any time and for any reason was expressly recognized. In the case of *The State, ex rel., v. Howat*, 109 Kan. 376, 198 Pac. 686, the court said:

"The statute expressly guards the privilege of any employee to quit his employment at any time. He may quit before controversy arises, when controversy arises, while controversy is raging, and after controversy has been adjusted. As many others as desire may do likewise, and they may do so as the result of mutual-interest consultations." (p. 416.)

In his message to the legislature the governor said:

"While these tragedies were impending, the state, through a receivership ordered by the supreme court, took charge of the mines and spent a week urging the miners to return to work for the state, to relieve the public from the menace of the famine. A proposal similar to the one they accepted several weeks later at Indianapolis was made to them by the state of Kansas. Many miners expressed the desire to accept it, but the leaders refused to allow them to return to work. A large number of miners expressed to me their desire to work, their lack of sympathy with the effort to freeze the public; but said that if they should go back to work their property would be in peril, their families humiliated, and their very lives endangered." (Senate Journal, Special Session 1920, p. 6.)

To free labor-union members from tyrannical domination by ruthless labor leaders, prevent meddlesome interference with the relation between employer and employee, and so secure continuity in production of coal, section 19 was inserted in the law.

The statute responded in part to a growing public sentiment for consolidation of multiplied administrative boards and commissions, and the legislative intention was that the court should become, as it did become, the repository of the functions of the public utilities-commission, the department of labor and industry, the industrial welfare commission, the free employment bureau, and other state agencies. While the public utilities commission has been divorced from the court of industrial relations, the court still has a large jurisdiction aside from that relating specifically to composing industrial disputes.

The opinion in the case of *Wolff Co. v. Industrial Court*, 262 U. S. 522, concludes as follows:

"We think the industrial court act, in so far as it permits the fixing of wages in plaintiff in error's packing house, is in conflict with the fourteenth amendment and deprives it of its property and liberty of contract without due process of law." (p. 544.)

The precise question here involved is whether it was intended that the provision against using official power to call strikes in the enumerated industries should stand, even if the provisions relating to regulation of wages be held unconstitutional. The legislature selected language which, if read literally, declared that to be its purpose, when it said that, if any section or provision should be found invalid, it should be conclusively presumed the rest of the act would have been passed without it. To avoid this effect it is necessary to read an exception into the act by interpretation, because of the intimate relation between forbidding strikes and furnishing another remedy for the wrongs against which they might be directed. The very fact that such relation must have been present to the mind of the legislature suggests that, if the exception had been intended, it would have been expressed. The conclusion is that, because of the provisions of section 28, section 19 is to be regarded as having the legal effect of an independent statute, making it a punishable offense for an officer of a labor union, acting in his official capacity, to call a strike of coal miners.

The judgment of the district court imposing upon Dorchy the penalties prescribed by section 19 of the court of industrial relations act, is reaffirmed.

Hopkins, J., not sitting.

Burch, J. (dissenting): The foregoing are the views of the majority of my associates.

It may be explained here that in this court cases are assigned after submission, but before consultation, by arbitrary rule. At consultation, the decision and the grounds of the decision are determined. The opinion of the court is then prepared by the justice to whom the case was assigned, in accordance with the directions given him at consultation. This method has been followed to the court's satisfaction for many years.

The coal strike of 1919-'20 prompted the statute, but the burden of the statute was the new kind of remedy for the adjustment of industrial disputes. In his message to the legislature the governor outlined the character of legislation which he believed should be adopted, basing it upon the proposition that operation of the great industries affecting food, clothing, fuel and transportation should be declared to be impressed with public interest, and, be-

cause so impressed, subject to reasonable regulation. He then said that *by means of such* legislation the state would be able to make strikes, lockouts, boycotts and blacklists *unnecessary* (italics mine). To my mind, the act discloses on its face that such was precisely the scheme of the legislation, and section 28 is to be given a reasonable rather than a literal application. If some labor leaders were sinners, some coal-mine operators were not saints, and deprivation of the remedy for grievance by strike of workmen, ordered and directed by union officers, is merely an incident and consequence of the erection of an administrative tribunal sitting to dispense industrial justice.

I have never supposed that a man who opened a strip-pit mine, producing a few tons of coal a day, was engaging in a business affected with a public interest in such manner as to subject conduct of that business to regulation on that ground. In my opinion, no public interest, in the legal sense, was involved when the court of industrial relations interfered in the business of the Wolff Packing Company. I had supposed, however, that under the stress of circumstances involving, or threatening immediately to involve, an entire industry like production of coal, and threatening the perils to which the people of this state were exposed by the coal strike of 1919-'20, law might accord with fact. During that winter the public was tremendously interested in continuity of production of coal—witness the action of ten thousand persons who volunteered to enter the coal mines of Kansas and take the places of striking miners. It seemed to me it would not be straining the categories of the law to say, correlatively, that in such an emergency the production of coal becomes impressed with a public interest, and subject to regulation by enforcible orders until warring operators and miners come to an agreement and resume production of coal, or the public is otherwise made secure against calamity. The state ought to have the same privilege to protect its people against the consequences of a coal strike that congress has to protect the people of the United States against the consequences of a transportation strike. When this court, without my concurrence, rendered its decision in the Wolff case, my gun-behind-the-door theory of the law went into the legal junk heap; and in view of the opinion of the supreme court of the United States in the Wolff case, it seems to me the majority of this court is not sustaining the act, notwithstanding an invalid provision, as section 28

The State v. Howat *et al.*

contemplates, but is sustaining a provision, although the act itself has become impotent to accomplish its purpose.

HARVEY, J. (dissenting): When the special session of the legislature met in 1920 and passed the act creating the court of industrial relations (some of the members objected to the word "court" being used to designate a commission without judicial functions, but it was insisted the word would give it a standing and influence which would enable it better to function, which insistence prevailed), its members, and those not members who were instrumental in the preparation and passage of the act, were mostly concerned with finding a way to prevent a repetition of the economic loss, the serious inconveniences, personal hardships amounting in some cases to actual suffering, which the public had sustained because of the general strike of November 1, 1919, in the bituminous coal fields. They were only indirectly concerned with the immediate problems between the operators and the miners. They wanted any measure passed to be just both to the employers and to the employees, whether considered singly or in groups. Hence the purpose was to frame a measure which would prevent injury to the public from a controversy between employers and employees and which would be fair when applied to them. It was thought that the public injury could be avoided by the reasonably continuous and efficient operation of essential industries. The production of fuel, food and clothing and the transportation of freight and passengers were regarded as essential industries—a general shutting down of any of these would cause serious loss and injury to the public; by their reasonably continuous and efficient operation the public would not suffer.

But how was that to be accomplished by legislation? Predicated upon the doctrine of *Munn v. Illinois*, 94 U. S. 113, and allied cases, if the essential industries named were declared by the legislature to be impressed with a public interest, and this declaration was approved by the courts, then legislation looking to the enforcement, as against both employers and employees, of this reasonably continuous and efficient operation of the essential industries could be made effective. This reasonable continuity and efficiency of the operation of the essential industries was then to be obtained by conducting hearings of controversies between employers and employees and making necessary and reasonable orders, which

could be enforced by proceedings in the courts. As these orders were to be made in fairness both to the employer and to the employees, there could arise no just reason for a shutdown or lockout on the one hand or a strike on the other, and each was made unlawful and penalties provided.

We must view the matter now in the light of the decision of the United States supreme court in the Wolff Packing Company case, 262 U. S. 522, where it was held that the essential industries named in the act—the production of fuel, food and clothing—are not impressed with a public interest, and that so far as the act attempts to authorize the industrial court to make and enforce orders upon employers in those industries concerning their relations with their employees, and especially as to wages, it is void. We must also view the matter in the light of the decision of that court in this case (264 U. S. 286), and say whether that part of the act making it an offense to call a strike and imposing penalties therefor stands as a valid provision of the act. It is my judgment, the purpose to provide for the reasonably continuous and efficient operation of essential industries, without injustice either to the employer or the employee, based upon the doctrine that the essential industries named are impressed with the public interest and authorizing the commission to conduct hearings and make orders which can be enforced in the courts and making the refusal to comply with such orders, either by the employer or the employee, an offense, should, for the purpose of construing section 28 of the act, be regarded as one provision. If the doctrine upon which the act is based and the parts of the act as to employers are invalid, it should necessarily follow that the parts of the act as to employees should be held invalid. This act did not seek to destroy labor organizations, but they were specifically recognized, encouraged, but not required to incorporate, and their right to bargain collectively for their members was recognized. The calling of a strike, not previously an offense in this state, was made an offense, with punishments, only because a court or commission was created which could hear their grievances and make reasonable orders which could be enforced.