## Brody, etc., et al. v. Marshall, Receiver of Taxes

A. L. *Hodes* and C. B. *Rhoads*, for plaintiffs.

A. *Wernick* and F. F. *Truscott*, for defendant.

OLIVER, P. J., May 18, 1950.—Plaintiffs attack the constitutionality of the Act of May 2, 1947, P. L. 143, 4 PS §201 et seq. on the grounds that it violates article I, secs. 1 and 9, of the State Constitution, and the fourteenth amendment to the Federal Constitution. The challenged provisions of the act provide that:

"The owner of every place of amusement shall . . . cause to be plainly stamped . . . on the face of every ticket . . . the established price . . . (and) . . . the maximum premium, which shall not exceed one-half the price of the ticket or the sum of one dollar ($1.00) whichever shall be less, plus lawful taxes . . ."

The act further provides for the licensing of ticket brokers and that it shall be unlawful to resell tickets to places of amusement at a price in excess of the maximum premium, plus the established price and lawful taxes as stamped or written thereon.

Plaintiffs rely on Tyson & Brother v. Banton, 273 U. S. 426 and Hertz Drivurself Stations v. Siggins et al., 359 Pa. 25, which in turn cites the Tyson case, Wolff Packing Co. v. Court of Industrial Relations, 262 U. S. 535, and Munn v. Illinois, 94 U. S. 113. Defendant contends that the Munn and Tyson cases, followed by the United States Supreme Court in a number of decisions, were finally overruled by that court in Nebbia v. New York, 291 U. S. 502 and later in Olsen v. Nebraska ex rel., 313 U. S. 236. After careful consideration we are convinced that defendant's position is sound.

Plaintiffs' position is premised on a new lease on the life of Lord Hale's classic phrase "affected with a public interest". They urge this indefinite term upon us as a definite test to be applied in determining the constitutionality of the act in question. Considering the origin of the phrase and the reasons attending its use (see Lord Hale's Essay, De Jure Maris, De Portibus Maris, Hargrave Law Tracts, pages 77, 78; McAllister, 43 Harvard Law Review 759; Hamilton, 39 Yale Law Journal 1089, and Keezer, 25 Michigan Law Review 596), it is difficult to find here a criterion for price fixing or even a clear cut rule of law, but the phrase was given vitality as a technical term belonging to the vocabulary of constitutional interpretation in Munn v. Illinois, 94 U. S. 113 (where an act regulating the charges of grain elevators was upheld), and attained the status of the "constitutional principle" applicable to price regulation in Wolff Packing Co. v. Court of Industrial Relations of the State of Kansas, 262 U. S. 522 (where a wage fixing provision of the compulsory arbitration statute of Kansas, as applied to a meat packing establishment, was held unconstitutional).

At the time of the Munn case the United States Supreme Court was well aware of the evils which fol-

lowed in the wake of lack of price regulation in the case of the railways. Regulation of rates was imperative. By employing the "public use" doctrine, the law of public utilities was given a promising start. See Chicago, Burlington & Quincy R. R. v. Iowa, 94 U. S. 155, and Peik v. Chicago & Northwestern Ry., 94 U. S. 164. But it was not easy to hold these doctrinaire tests to the service of the causes which called them into being, and regardless of how casually or carefully the phrases "public use" or "affected with a public interest" were employed, the court, in its concern over the railroad problem, grain elevators, carriers for hire and other public utilities, tended to identify one with the other, so that in German Alliance Insurance Co. v. Kansas, 233 U. S. 389 (where the State of Kansas sought to regulate the rates to be charged for insurance against fires) the court ignored the concept of property devoted to a public use and affected the insurance business with a public interest. Years later in Tyson & Brother v. Banton, 273 U. S. 418 (in a five-to-four decision, Justices Holmes, Brandeis, Stone and Sanford dissenting) the Supreme Court held invalid a New York statute regulating the resale price of theatre tickets. The business of reselling theatre tickets could not at that time pass the "affected with a public interest" test. The strong dissenting opinion of Mr. Justice Holmes, joined in by Mr. Justice Brandeis, states at page 446:

"I think the proper course is to recognize that a state legislature can do whatever it sees fit to do unless it is restrained by some express prohibition in the Constitution of the United States or of the State, and that Courts should be careful not to extend such prohibitions beyond their obvious meaning by reading into them conceptions of public policy that the particular Court may happen to entertain . . ."

The test employed by the majority of the court in the Tyson case was subsequently applied to a New Jersey statute, leveled at the evils attending trafficking in jobs, by subjecting fees charged by employment agencies to the approval of the Commissioner of Labor, in Ribnik v. McBride, 277 U. S. 350; to a Tennessee statute regulating the price of gasoline, in Williams v. Standard Oil Co., 278 U. S. 235, and to an Oklahoma statute declaring the manufacture of ice a public business and prohibiting any person from engaging therein without a certificate of convenience and necessity, in New State Ice Co. v. Leibmann, 285 U. S. 262. In each case the statute was held repugnant to the Constitution. Mr. Justice Brandeis, dissenting in the Leibmann case, reiterated Mr. Justice Stone's dissent in the Ribnik case, asserting that as regards power to regulate, there is no difference in essence between a business called private and one said to be affected with a public interest. The limitation imposed by due process requires only that ". . . *regulation shall not be unreasonable, arbitrary or capricious; and that the means of regulation selected shall have a real or substantial relation to the object sought to be obtained"*: 285 U. S. 262, 302. (Italics supplied.)

The vigorous dissenting opinions mentioned above finally came to the foreground in Nebbia v. New York, 291 U. S. 502, and the fictional "public interest" test was expressly repudiated. Mr. Justice Roberts, speaking for the court at 515 et seq., states that in the Munn case:

". . . this court concluded the circumstances justified the legislation as an exercise of the governmental right to control the business in the public interest; that is, as an exercise of the police power . . . 'affected with a public interest' is the equivalent of 'subject to the exercise of the police power'; and it is plain that nothing more was intended by the expression. It is clear

that there is no closed class or category of businesses affected with a public interest, and the function of courts in the application of the Fifth and Fourteenth Amendments is to determine in each case whether circumstances vindicate the challenged regulation as a reasonable exertion of governmental authority or condemn it as arbitrary or discriminatory. . . . *The phrase 'affected with a public interest' can, in the nature of things, mean no more than that an industry, for adequate reason is subject to control for the public good."* (Italics supplied.)

The Nebbia case was confirmed in Olsen v. Nebraska ex rel. Western Conference, 313 U. S. 236, and adopted by the Supreme Court of Pennsylvania in Rohrer v. Milk Control Board, 322 Pa. 257, and Commonwealth v. Zasloff, 338 Pa. 457. See also Howarth et ux. v. Gilman et al., 164 Pa. Superior Ct. 454, and Commonwealth v. Summons, 157 Pa. Superior Ct. 95.

The present inquiry then is to determine whether the provisions of the Act of May 2, 1947, P. L. 143, are so arbitrary, unreasonable and capricious, so palpably unnecessary in their severity and comprehensiveness for the accomplishment of the object sought to be attained, as to amount to an unjustified interference with private business and property, and a violation of the due process clause of the United States Constitution and article I, secs. 1 and 9 of the State Constitution. It should be noted that the act does not attempt to regulate the price at which theatre owners and other amusement enterpreneurs may offer their separate entertainments to the public. Here we are confronted with the sole question of whether the business of ticket brokers, who intervene between the owners and the general public in the sale of tickets, may be regulated by the legislature to the extent of preventing them from reselling tickets at more than a reasonable advance over the theatre prices.

It is common knowledge that ticket brokers, by virtue of arrangements made with the theatre owners, ordinarily acquire an absolute control of the most desirable seats, and in some cases all of the seats in the theatres. They are thereby placed in position to exact an extortionate advance in prices for the sale of such tickets, consequently depriving the public of the opportunity of purchasing tickets at the regular prices and, in many instances, access to the theatres themselves. This is the "virtual monopoly", the "exercised evil" which the act seeks to remedy.

We have no doubt that the State in the exercise of its police power could prohibit ticket "scalping" altogether if the legislative intent be aimed at the suppression of a monopoly. Why then can it not exercise the same power to protect its citizens against the predatory practices of a few? The Federal Constitution does not guarantee the unrestricted privilege to engage in business: Nebbia v. New York, supra; nor is that right sacrosanct and wholly immune from State regulation: Commonwealth v. Zasloff, supra. Our concern is with legislative power, not policy, and we are firmly convinced that the legislature may, in the exercise of its police power, regulate any business to protect the public against extortionate and unjust practices. See Kelly-Sullivan, Inc., et al. v. Moss, 39 N. Y. S. (2d) 797, 800, where the court in upholding the constitutionality of a statute similar to the one under discussion, said, "Without attempting to limit by definition, unless expressly forbidden by the Constitution the criteria of legislative power is the promotion of the general public welfare". See also Mr. Justice Bernstein's scholarly and comprehensive opinion in the earlier case of Kelly-Sullivan, Inc. v. Moss, 22 N. Y. S. (2d) 491.

In modern times one of the most cherished features of life in a big city—compensating for the crowded

conditions and the greater expense of city living—is the wealth of opportunities it affords to see and hear first-class theatre, music and athletic contests. Efforts on the part of scalpers to monopolize tickets and charge fantastic prices therefor for great drawing events, always bring forth an outburst of public indignation, from virtually all citizens and not merely from those who actually expect to attend. In some outstanding instances such efforts bring actual discredit upon the city itself.

We fully agree with the views expressed by Mr. Justice Holmes in his dissent in the Tyson case at page 447:

". . . it seems to me that theaters are as much devoted to public use as anything well can be. We have not that respect for art that is one of the glories of France. But to many people the superfluous is the necessary, and it seems to me that Government does not go beyond its sphere in attempting to make life livable for them. I am far from saying that I think this particular law a wise and rational provision. That is not my affair. But if the people . . . speaking by their authorized voice say that they want it, I see nothing in the Constitution of the United States to prevent their having their will."

We find no merit in the allegations that the maximum premium fixed by the statute is unreasonable, confiscatory or discriminatory. The selected means do not transgress the necessities of the case. As a matter of fact, the brokerage business flourishes daily under the act, notwithstanding allegations of deprivation and discrimination. Further, we find nothing in the act which indicates that the means selected are not real or substantially related to the end sought to be attained.

It is plaintiffs' contention that in Hertz Drivurself Stations v. Siggins et al., 359 Pa. 25, the Supreme Court of Pennsylvania reincarnated the test "affected with a

public interest" as the constitutional principle to be applied to cases involving legislative power to regulate private business. We do not agree with this contention. It is our opinion that the proper determinative criteria is set forth above and that we are not precluded from applying the same by the Hertz decision.

The Hertz case dealt with the constitutionality of the Act of June 5, 1943, P. L. 901, which required that a certificate of convenience and necessity be obtained from the Public Utility Commission in order to engage in the business of leasing motor vehicles without drivers to selected customers. The court found that the business possessed no governmentally conferred exclusive privilege or franchise; that it had no monopoly; that its property was not devoted to a public use; that its customers were selected, and that the public had no right to expect that the leasing service would be available at all times to anyone demanding it. The court stated that the business was not affected with a public interest, and that property so employed was not amenable to legislative regulation.

The decision is distinguishable in that it deals primarily with the law as applied to public utilities. It states that for an industry to be subject to public utility law, it must be one that is dedicated to the public use so that it may enjoy a franchise or privilege for the performance of a service, one for which the public has a real and continuing need and no ready means of obtaining it otherwise. Also, it is apparent from a reading of the opinion that the attempted exercise of the police power was not in the public interest but rather for the benefit of the privileged common and contract carriers. At page 47 of the opinion Mr. Justice Jones states:

". . . the Act otherwise represents a legally unjustifiable exertion of the State's police power. In any

circumstances, an exercise of such power, if it is to be valid constitutionally, must bear a reasonable relation to a lawful end sought to be attained thereby. In short, the police power can never be exerted legally except it be exercised in the public interest. Consequently, unless a given exercise of the power promotes or tends to promote the public safety, health, morals, or welfare, it is without constitutional sanction."

Finally, in addition to recognizing the inadequacies of the "public interest" test, Mr. Justice Jones indicated that the test was not to be universally applied, saying, pages 37-38:

"The fact of the matter is that confusion seems to have been unnecessarily injected into the concept of public regulation of private property by treating all such regulations as constituting similar exertions of power. It is true that the exerted power (i.e., legislative) is the same in all instances, but, obviously, a different basis of justification for its exercise must be found where the impact is visited upon a legitimate, sanitary and decent private business on the one hand and, on the other where the property so regulated constitutes a fire hazard of public concern . . . or a 'poaching' upon the product of an employee's toil. . . . Of course, in instances such as are last above cited, an 'affection with a public interest' was by no means essential to a constitutional legislative correction of the exorcised evil." See Paulsen, Substantive Due Process, 34 Minn. L. R. 91.

In conclusion, therefore, it is our opinion that the Hertz case deals with the law as applied to public utilities and is not controlling here. We do not believe that the Pennsylvania Supreme Court, in discussing generally the "public interest" test, intended to overrule its former decisions in the Rohrer and Zasloff

cases, or intended to differ from the present legal philosophy of the United States Supreme Court as set forth in the Nebbia and Olsen cases. Notable is the absence of affirmative language to this end.

For the reasons assigned herein the injunction is refused and the complaint dismissed.