## OKLAHOMA NATURAL GAS CORP. v. STATE et al.

No. 22061. Opinion Filed June 14, 1932.

Rehearing Denied Dec. 27, 1932.

Allen, Underwood & Canterbury, for plaintiff in error.

James W. Finley, Hayes McCoy, R. E. Cullison, Johnson & Jones, and S. A. Horton, for defendants in error.

KORNEGAY, J. This is an appeal from an order of the Corporation Commission, made concerning the taking of gas under the gas proration law of the state. The order of the Commission is as follows:

"Findings of Fact, Opinion and Order.

"On the 16th day of November, 1929, complainants Ed Gardner, W. M. Dowell, A. A. Dowell, Tom McVey and Theodore Watson, filed their complaint with this Commission against respondents the Oklahoma Natural Gas Corporation and the Empire Gas & Fuel Company, in which the Commission is asked to make and enter an order requiring the Empire Gas & Fuel Company to connect its pipe line or lines with a certain gas well designated as Shannon No. 1, located in sec. 36, twp. 15 N., range 7 E. Creek county, Okla., and to take therefrom an amount of gas sufficient to equalize the takings from said well as compared with the gas taken from other wells with which the Empire Gas & Fuel Company's lines are connected in the same vicinity, and asking that the Oklahoma Natural Gas Corporation be ordered, directed, and required to permit the said Empire Gas & Fuel Company to connect its pipe line to said well for the purpose of equalizing the takings therefrom as compared with the taking from other wells offsetting same, to which the Empire Gas & Fuel Company's lines are now connected.

"The complaint sets forth that complainants are the owners of a one-eighth oil and gas royalty interest in and to 72½ acres located in the NE¼ of the NE¼, and the NE¼ of the SE¼ of the NE¼ and the W½ of the SE¼ of the SE¼ of the NE¼ and the SW¼ of the SE¼ of the SE¼ of the NE¼ and the E½ of the W½ of the SE¼ of the NE¼ and the E½ of the W½ of the W½ of the NE¼ and the E½ of the W½ of the W½ of the SE¼ of the NE¼, all in sec. 36 twp. 15 N., range 7 E., Creek county, Okla., and that the Olean Petroleum Company, a corporation, is the owner and holder of an oil and gas mining lease covering said above-described premises, and that said Olean Petroleum Company had, in the month of November, 1926, entered into a contract with the respondent Oklahoma Natural Gas Corporation by the terms of which the said Oklahoma Natural Gas Corporation was to purchase and remove from the lease above described, the natural gas then being produced and to be produced in the future on

said lease from two gas wells which had been drilled and completed thereon—the wells being known and designated as Shannon No. 1 and Shannon No. 2; that Shannon Well No. 1 since its completion in the month of November, 1926, has had an open flow capacity of 65,000,000 cu. ft. of natural gas per day; that the Lima Oil & Gas Co. are the owners of an oil and gas lease covering the SW¼ of the SW¼ of sec. 30, twp. 15 N., range 8 E., Creek county, Okla., and that said company on or about the 1st day of November, 1926, drilled to completion two natural gas wells located in the SW corner of the lease described, the wells being commonly known and designated as Benjamin No. 2 and Benjamin No. 3; that the well known and designated as Benjamin No. 2 has an open flow of 15,204,000 cu. ft. of natural gas per day, and that the well known as Benjamin No. 3 has an open flow of 42,177,000 cu. ft. per day; that the Empire Gas & Fuel Company has, since the month of November, 1926, under the terms of a written contract entered into with the Lima Oil & Gas Co., purchased and removed from this lease the natural gas produced therefrom in quantities very largely in excess of the amount of gas which the Oklahoma Natural Gas Corporation was able and willing to purchase or take from the wells in which these complainants are interested as royalty owners, notwithstanding the fact that the well known as Shannon No. 1 in which said complainants are interested as royalty owners has an open flow capacity of gas in excess of the combined open flow of both the wells belonging to the Lima Oil & Gas Company to which said Empire Gas & Fuel Company has connected its lines; that since November 1, 1926, and up to and including September 30, 1929, the Oklahoma Natural Gas Corporation has purchased and removed from the wells owned by these complainants and in which they are interested as royalty owners, 1.177,151,000 cu. ft. of natural gas, while the Empire Gas & Fuel Company has purchased and removed from the offsetting wells belonging to the Lima Oil & Gas Company and described as Benjamin Well No. 2 and Benjamin Well No. 3, 3,416,072,000 cu. ft. of gas, or 2,238,921,-000 cu. ft. of gas in excess of the amount which the Oklahoma Natural Gas Corporation has been able or willing to take from the well of these complainants or from the well in which they are interested as royalty owners; and that by reason of said unequal taking as between the Oklahoma Natural Gas Corporation and the Empire Gas & Fuel Company, complainants have been and are now sustaining great and irreparable damage and loss from the fact that the gas belonging to complainants owing to the inequitable and unequal taking as between two said common purchasers of gas, is being drained from beneath the premises of complainants and the wells in which they are interested and taken out from the wells offsetting those of complainants and

to which the lines of the Empire Gas & Fuel Company are now connected and belonging to the Lima Oil & Gas Company. A plat was attached to the complaint showing the location of the wells and their relative position in the common pool under consideration.

"It is then charged that the Empire Gas & Fuel Company and the Lima Oil & Gas Company, as well as the fee and royalty owners, are securing an unfair proportion of the gas in said field in violation of sec. 7923, C. O. S. 1921, in that respondents Oklahoma Natural Gas Corporation and the Empire Gas & Fuel Company, common purchasers of gas from such common source of supply, are not purchasing natural gas from each producer in said pool ratably in proportion of the natural flow of the gas wells owned by producers in said field, as required by said section 7923, C. O. S. 1921.

"To this complaint both the Oklahoma Natural Gas Corporation and the Empire Gas & Fuel Company filed responses; the Empire Gas & Fuel Company waiving the issuance of process or the serving of notices prescribed by law, and entering its appearance specially for the purpose of objecting to the jurisdiction and power of the Commission to grant to complainants the relief prayed for, for a number of reasons, the particular ones being as follows, to wit:

"1. That sections 7923 and 7924, C. O. S. 1921, do not purport to confer jurisdiction or power on the Commission to require parties to break contracts for the sale and purchase of natural gas and the delivery thereof between contracting parties.

"2. On the ground that complainants had not shown that sec. 7923, C. O. S. 1921, has been violated nor that respondent Empire Gas & Fuel Company has taken more gas from the gas wells to which it is connected than the proportion of the natural flow of the wells to which it is connected as compared with the natural flow to the common source of supply, and that respondent has not at any time taken more of the open flow than it is permitted to take under the laws of the state of Oklahoma and the rules of this Commission, nor more than may be marketed without waste, from said source of supply, and generally, that the language of sec. 7924 does not require respondent to purchase ratably from those from whom it has not contracted to take gas, and that a requirement such as is contemplated by complainants herein would be in violation of subdivision 1 of sec. 10 of art. 1 of the Constitution of the United States which provides that: 'No state shall * * * pass any bill of attainder, ex post facto law, or law impairing the obligation of contracts, or grant any title of nobility.'

"3. That respondent Empire Gas & Fuel Company is a producer and purchaser of natural gas in several states, transporting same by means of large pipe lines connected into one unified system through which it transports gas into many and through the states of Texas, Oklahoma, Kansas and Missouri, and is engaged in the sale of large quantities of natural gas at wholesale in the different states in one commingled and unseparable mass from the initial points of production to the ultimate point of delivery, the actual volume of which amounts to from two hundred million to three hundred million cubic feet, and that said business is commerce among the several states as used in clause 3 of sec. 8 of art. 1 of the Constitution of the United States of America and is of national and not local concern, subject only to regulation by the Constitution of the United States of America, and that complainants are seeking to have the Commission to attempt to regulate interstate commerce which it has no authority to do.

"The response of the Oklahoma Natural Gas Corporation raises substantially the same question and objects to the jurisdiction of the Commission and to the authority of the Commission to grant the relief prayed for. In addition it alleges that it is a public service corporation engaged in the production, transmission and distribution of natural gas in the various cities and towns of the state of Oklahoma and that it has undertaken the public duty of supplying gas to the citizens and residents, both domestic and commercial located in various cities and towns within the state of Oklahoma in acordance with the current requirements of its customers. It then admits entering into a contract on or about the 11th day of November, 1926, for the natural gas produced upon the lease in which complainants are interested and to take the natural gas from the wells involved in this controversy, by the terms of which contract the lease owner agreed to sell and deliver and respondent agreed to purchase and receive all of the merchantable gas produced from the wells located on said premises and that said contract was made by the lease owners with full right and authority on their part, and that said contract has been observed and carried out by each of the respective parties and is still in full force and effect and that respondent is now taking gas from the premises under said gas purchase contract. It is then alleged that the Corporation Commission has no power or jurisdiction, at the behest or instance of the royalty owners, to interfere with the contractual obligations existing between respondent and the lease owners by virtue of said contracts, and that the Commission has no jurisdiction to amend, modify, annul, abrogate or suspend the provisions of said contract in any manner, or to impair same and that the Commission has no power to require the Empire Gas & Fuel Company to connect with any gas wells located on the properties covered by the gas purchase contract held by the Oklahoma Natural Gas Corporation or to be required to take any

amount or any percentage of the open flow of gas from the wells located upon said land, and that complainants have no right to make a contract with the Empire Gas & Fuel Company or any other person for the sale of any of said gas, and that the complainants have no right to invoke the aid of the Commission in compelling or requiring the Empire Gas & Fuel Company, or any other person to purchase gas from said leaseholds which they cannot lawfully contract to sell, and that any attempt by the Commission to do any of the things mentioned would interfere with and impair the right of the Oklahoma Natural Gas Corporation under its said purchase contract and would do violence to art. 2 of sec. 15 of the Constitution of the state of Oklahoma, as well as to art. 1 of sec. 10 of the Constitution of the United States both of which provisions prohibit the impairment of contractual rights; that any interference by the Commission based upon the complaint of complainants, would be a direct deprivation of respondent's property rights without due process of law in violation of art. 2, sec. 7, of the Constitution of the state of Oklahoma, and sec. 1 of the 14th Amendment to the Constitution of the United States. It is then alleged that the Commission is without power at the instance of complainants, to make any order in the premises that would tend to disable or render respondent unable to perform its duties as a public utility in furnishing natural gas to its customers throughout the state of Oklahoma or that would impair or diminish its gas reserves, or would jeopardize or destroy the investment which respondent has in gathering lines and pipe lines which have been made and constructed in the territory of the premises described. Each of said respondents pray the Commission to dismiss the complaint for the reasons set forth in each of said responses.

"The matter was set for hearing before the Commission on November 29, 1929, upon which date the parties appeared and after some discussion and the entry of certain stipulations the matter was continued until the 29th day of January, 1930, for the purpose of gauging the wells involved in said hearing, and testing the open flow, to be presented at later hearings. It was also ordered that the Olean Petroleum Company, Marquette Oil Company, Devonian Oil Company, Tidal Oil Company, Phillips Petroleum Company, Lima Oil & Gas Company, Magnolia Petroleum Company. Cities Service Gas Company, Glenora Refining Company, Southwest Production Company. and Southwest Pipe Line Company be made parties respondent to this cause.

"At the hearing on January 29, 1930, none of the new parties made at the original hearing and ordered to be made parties at that time, entered any appearances; all the other parties appeared and presented testimony as well as entered into stipulation

with respect to the matters and things involved.

"The major facts involved in the controversy are covered by stipulations made and entered into and dictated into the record by counsel for the Oklahoma Natural Gas Corporation at the original hearing on November 29, 1929, as well as on January 29, 1930. At the hearing on November 29, 1929 it was stipulated into the record, subject to the objection made to the jurisdiction of the Commission, that the Olean Petroleum Company and the Marquette Oil Company are the owners of the oil and gas lease upon which the wells described by complainant are located; that complainants are the owners of the royalty interest under said oil and gas lease and that the lease provides that the lessees will account to the owners or fee-holders for one-eighth of all the gas sold off the premises, and that on the 11th day of November, 1926, the Gladys-Belle Oil Company and the Olean Petroleum Company executed a contract for the sale of gas to the Oklahoma Natural Gas Corporation, a copy of which is attached to the response made by that company; that said contract may be considered in evidence; that the Oklahoma Natural Gas Corporation has taken and received gas in the usual conduct of its business under such gas purchase contract, from the wells described in the complaint as Shannon No. 1 and Shannon No. 2; that the Oklahoma Natural Gas Corporation is now receiving gas from said wells under said lease purchase contract, paying the lessees for their benefit and the benefit of the royalty owners ten cents per thousand cubic feet; that up to the 30th day of September, 1929, the Oklahoma Natural Gas Corporation had purchased and received from Shannon No. 1 well, the amount of 1,177,151,000 cu. ft. of natural gas; that the Lima Oil & Gas Company is the owner of an oil and gas lease covering the S. W.¼ of the S. W.¼ of sec. 30, twp. 15, range 8 E., Creek county, Okla., and that there have been drilled on said lease two wells known as Benjamin No. 2 and Benjamin No. 3; that the Cities Service Gas Company has taken and received under a gas purchase contract between it and the lessees of said oil and gas leaseholds, from Benjamin Well No. 2 since November, 1926, and up to and including September 30, 1929, the amount of 1,066,000,000 cubic feet of gas, and during the same period has taken from Benjamin Well No. 3 the amount of 2,350,071,000 cu. ft. of gas, and has paid to the lessees the sum of eight cents per thousand cubic feet for the gas; that the plat marked 'Exhibit No. 1,' may be considered in evidence showing the location of the wells on complainant's property and adjacent properties, the wells having a circle marked outside of them being wells to which the Cities Service Gas Company is connected under gas purchase contracts and the wells having a square or rectangle outside of them are the

wells the Oklahoma Natural Gas Corporation· is connected to under its contract and from which it is receiving gas.

"After the hearing on January 29, 1930, the above stipulation was supplemented by bringing the amount of the takings of natural gas from the wells involved, down to and including the month of January, 1930. It was stipulated by counsel for the Oklahoma Natural Gas Corporation that from Shannon Well No. 1 there was taken from November. 1926, down to and including the month of January, 1930, 1,463,237,000 cu. ft of gas, and that from the month of February, 1928, down to and including the month of January, 1930, the Oklahoma Natural took from Shannon Well No. 2 the amount of 262,712,-000 cu. ft. of gas under the contracts heretofore referred to; that from Benjamin No. 2 the Empire Gas & Fuel Company or the Cities· Service Company from October, 1926, down to and including December 22, 1929, received 1,187,477,000 cu. ft. and that from Benjamin No. 3 from January 28, 1927, to December 22, 1929, it took 2,666,046,000 cu. ft. under its gas purchase contracts. It was stipulated that the tabulation marked Exhibit No. 2 shows the withdrawals from Shannon No. 1 and Shannon No. 2 by months up to and including October 22, 1929, and that there will be supplied a similar computation for the months of November and December, 1929, and January, 1930.

"Other stipulations were entered into with respect to reports filed by the gas companies, with the Corporation Commission, reflecting the amount of gas withdrawn from the wells involved during the period under consideration. It was also agreed that Exhibits No. 7, 8, 9 and 10 shall be received, in evidence, same being calculations of Commission's engineer Mr. Luskey, showing the manner used in arriving at the open flow of the wells in controversy.

"There was considerable testimony presented by respondents showing the nature of the business engaged in by them, and the objects and purposes had in mind by respondents in making and entering into contracts for the purchase of gas supplied in the rendition of the public service in which they are engaged. Also, some testimony with respect to the investment which has been made necessary by the extension of the main and gathering lines of respondents in order that they may connect with the wells from the field under consideration. The objections of respondents were mainly legal, based upon constitutional objections, particularly with respect to the impairment of the obligations of contract. It is admitted that the contracts in question have all been entered into since the passage of the statute under which the Commission possesses jurisdiction to require a ratable and fair taking of natural gas by common purchasers without discrimination in the state of Oklahoma.

"The Commission is not unmindful of some of the difficulties which may be encountered in the matter of the equitable distribution of the amount of gas taken and purchased from producers having their productions connected to the lines of different and separate common purchasers in any common source of supply. However, the Commission is of the opinion that such difficulties as have been pointed out to it and shown in the record, are not by any means unsurmountable, and in the face of the statute there is no doubt as to the course which the Commission, under the law, is obligated to pursue. It would be manifestly unfair to permit a contract to be entered into by and between common purchasers of natural gas from the same field by which one common purchaser taking large quantities of natural gas could drain the field as against a similar common purchaser holding a similar contract to take smaller quantities of gas from the same pool. We cannot believe that the statute under which the Commission possess jurisdiction contemplated any such condition or is subject to any such evasion of its terms as would be possible should such a construction as that be placed upon the law. It is evident that the purpose of the statute and the purpose of the Legislature in enacting same, was to secure to every producer of natural gas from any given source of supply equal and fair treatment with respect to the availability to a market for his product upon equal terms and without discrimination as between himself and his neighbor.

"Section 7923, C. O. S. 1921, lays down the rule for the taking of gas from any common source of supply as well as establishes the rule of apportionment as between producers under such conditions as is contemplated by its terms. It provides:

" 'That whenever the full production from any common source of supply of natural gas in this state is in excess of the market demands, then any person, firm or corporation, having the right to drill into and produce gas from any such common source of supply, may take therefrom only such proportion of the natural gas that may be marketed without waste, as the natural flow of the well or wells owned or controlled by any such person, firm or corporation bears to the total natural flow of such common source of supply having due regard to the acreage drained by each well, so as to prevent any such person, firm or corporation securing any unfair proportion of the gas therefrom; provided that the Corporation Commission may by proper order, permit the taking of a greater amount whenever it shall deem such taking reasonable or equitable. The said Commission is authorized and directed to prescribe rules and regula-

tions for the determination of the natural flow of any such well or wells, and to regulate the taking of natural gas from any or all such common sources of supply within the state, so as to prevent waste, protect the interests of the public, and of all those having a right to produce therefrom, and to prevent unreasonable discrimination in favor of any one such common source of supply as against another.'

"Section 7924, C. O. S. 1921, is the section which defines and deals with common purchasers of natural gas and which requires fair treatment as between the various producers of natural gas within the state of Oklahoma where same is being produced from a common source of supply. That statute provides:

" 'That every person, firm or corporation, now or hereafter engaged in the business of purchasing and selling natural gas in this state, shall be a common purchaser thereof, and shall purchase all of the natural gas which may be offered for sale and which may reasonably be reached by its trunk lines or gathering lines without discrimination in favor of one producer as against another or in favor of any one source of supply as against another save as authorized by the Corporation Commission after due notice and hearing; but if any such person, firm or corporation shall be unable to purchase all the gas so offered, then it shall purchase natural gas from each producer ratably. It shall be unlawful for any such common purchaser to discriminate between like grades and pressures of natural gas, or in favor of its own production, or of production in which it may be directly or indirectly interested, either. in whole or in part but for the purpose of prorating the natural gas to be marketed, such production shall be treated in like manner as that of any other producer or person, and shall be taken only in the ratable proportion that such production bears to the total production available for marketing. The Corporation Commission shall have authority to make regulations for the delivery, metering and equitable purchasing and taking of all such gas and shall have authority to relieve any such common purchaser, after due notice and hearing. from the duty of purchasing gas of an inferior quality or grade.'

"Section 7925 is the section which outlines the procedure before the Corporation Commission upon any question relating to the enforcement of the act.

"Section 7926 deals with the matter of appeals to the Supreme Court in the same manner as appeals are allowed from other orders of the Corporation Commission.

"Section 7927 empowers the Commission with authority to make regulations and to employ or appoint such agents as may be necessary to enforce the terms and provisions of the act.

"Section 7928 requires all persons, firms or corporations, as a condition precedent to their possession enjoying or exercising the right of eminent domain, right of way, right to locate, maintain, construct or operate any pipe lines, fixtures or equipment belonging thereto or used in connection therewith, for the carrying or transportation of natural gas for hire or otherwise, and as a condition precedent to its engaging in the business of purchasing, piping or transporting natural gas as a public service or otherwise, to file its proper and explicit authorized acceptance of the provisions of the act.

"Under these sections of the statute there is not only imposed the duty upon common purchasers of natural gas within the state of Oklahoma to take the gas of all without discrimination, but as if that was not sufficient, section 7928 imposes an obligation upon all such concerns to accept explicitly and with the proper authority all the terms and provisions of the act as a condition precedent to its engaging in the business of transporting, purchasing or piping natural gas at all. We assume that each of the respondents in this case have filed these acceptances and have obligated themselves to conform to the terms and provisions of the statute as required by law.

"Under the language used in section 7924 it is made unlawful for any common purchaser to discriminate between like grades and pressure of natural gas or in favor of its own producer or production in which it may be directly or indirectly interested either in whole or in part, and all of such production is required to be treated in like manner as that of any other producer or person and shall be taken only in the ratable proportion as such production bears to the total production available for marketing.

"Since the common purchaser is required to deal with its own gas just exactly as it is required to deal with the gas of other producers, notwithstanding it may be the sole owner thereof it would appear that the making of a contract with a producer would not relieve such common carrier of full compliance with the statute with respect to like grades and pressures of other producers who may not be under contract with the common purchaser. In other words, if a common purchaser may not discriminate in favor of its own production, then it would appear. under the statute, that it should not be permitted to make a contract with respect to the purchase of natural gas which would in any wise work a discrimination either for or against the person contracted with.

"The expense to which the Oklahoma Natural Gas Corporation has gone in laying its pipe lines. of course was incidental to the taking of gas generally in the field in question. and the entire expense of $300,000 which was testified to could not be at all

attributable to the two wells from which it is taking gas and which are involved in this controversy. Of course a certain portion of that investment would be attributable to the accommodation afforded in the taking of the gas from these wells but just such proportion as would properly be allowable as between these wells and all other wells served thereby.

"Now on this the 1st day of August, 1930, the Commission having under consideration the matters and things involved in this cause, together with the evidence taken at the hearing, is of the opinion and finds:

"First: That the Oklahoma Natural Gas Corporation and the Empire Gas & Fuel Co. are each common purchasers of natural gas from the common source of supply from which all the wells involved in this controversy are producing gas.

"Second: That the Oklahoma Natural Gas Corporation has a gas purchase contract with the lessees of the lease in which complainants Ed Gardner, W. M. Dowell, A. A. Dowell, Tom McVey and Theodore Watson are the owners of one-eighth oil and gas royalty interests.

"Third: That the Empire Gas & Fuel Co. has a purchase contract with the lessees of the oil and gas lease covering the S. W. ¼ of the S. W. ¼ of sec. 30, twp. 15 N. range 8 E. in Creek county, Okla., and are taking gas from wells drilled thereon offsetting the wells in which complainants herein, Ed Gardner, W. M. Dowell, A. A. Dowell, Tom McVey, and Theodore Watson own a royalty interest.

"Fourth: That on November 29, 1929, and since the month of November, 1926, the Oklahoma Natural Gas Corporation had taken from the wells in which complainants are interested, 1,177,151,000 cu. ft. of gas, while for the same period of time the Empire Gas & Fuel Company have taken from the offsetting wells upon which it had a gas purchase contract, 3,416,072,000 cu. ft. of gas, or 2,238,921,000 cu. ft. in excess of the amount of gas which the Oklahoma Natural Gas Corporation was able and willing to take from the gas well on the lease under which complainants own and control a one-eighth royalty interest.

"Fifth: That under the facts and circumstances shown by the evidence, the owners of the gas of which complainants own a one-eighth interest as royalty owners, would be deprived of the right to produce and sell their ratable proportion of the natural gas produced from said lease, together with the proceeds from the production and sale thereof.

"Sixth: That both the Oklahoma Natural Gas Corporation and the Empire Gas & Fuel Company as common purchasers of natural gas from this common source of supply, are legally obligated to take and purchase the gas produced from this common source of supply, without discrimination as between the various producers of natural gas therefrom so as to prevent any producer securing an unfair proportion of the gas.

"Seventh: That the various legal objections raised by respondents Oklahoma Natural Gas Corporation and the Empire Gas & Fuel Company, as contained in the answer and response filed herein, should be overruled and the Empire Gas & Fuel Company should be required to connect its pipe line or lines with the gas well designated as Shannon No. 1, and of which complainants Ed Gardner, W. M. Dowell, A. A. Dowell, Tom McVey and Theodore Watson are the owners of the royalty interest, and take therefrom such a quantity of gas as will result in an equitable and ratable taking of natural gas from this well as compared with the amount of gas that said Empire Gas & Fuel Co. is taking from the offset wells, so as to prevent the lessee or royalty owners of the lease from which the Empire Gas & Fuel Co. is taking its gas from securing an unfair proportion of the gas from said common source of supply, taking into consideration the open flow of said wells as is required by secs. 7923 and 7924, C. O. S. 1921; and that the Oklahoma Natural Gas Corporation should be required and ordered to permit the Empire Gas & Fuel Co. to so connect its pipe lines with the transportation facilities so as to attain these results.

"It is therefore the order of the Commission, premises considered, that the Empire Gas & Fuel Company be and it is hereby ordered and required to connect its pipe line facilities with the well known and described in this cause as Shannon Well No. 1, located in the northeast corner of sec. 36, twp. 15 N., range 7 E. Creek county, Okla., and to take therefrom the amount of gas sufficient to equalize that proportionate and ratable taking of natural gas from said well as will result in a ratable taking of gas therefrom as compared with the taking of natural gas by said Empire Gas & Fuel Company from offsetting wells, so as to result in the taking of that ratable proportion that such production bears to the total production available for market.

"It is the further order of the Commission, premises considered, that the Oklahoma Natural Gas Corporation be and it is hereby required and ordered to permit the Empire Gas & Fuel Company to connect its pipe line facilities with said Shannon Well No. 1 so that the Empire Gas & Fuel Company may take from said well that ratable proportion produced therefrom that the production thereof bears to the total production available for market.

"This order to be in full force and effect from and after ten days from the date hereof.

"Done at Oklahoma City this the 1st day of August, 1930.

"Corporation Commission of Oklahoma.

"(Signed) C. C. Childers, Chairman.

"Fred Capshaw, Commissioner."

"Attest:

"E. D. Hicks, Jr. Sec."

The case was brought here on the 21st of January, 1931, and a brief of plaintiff in error was filed the 11th of July, 1931, and the defendant in error filed a brief on August 12, 1931, and an answer brief of defendants in error was filed on January 6 1932.

The brief of the plaintiff in error sets out some of the facts that are recited in the order. It appears from the findings that the Empire Gas & Fuel Company, with considerable less potential out of two offsetting wells, had taken 3,416,072 M. cubic feet of natural gas, which was in excess of the amount taken from an offsetting well owned by different people, taken by the Oklahoma Natural Gas Corporation of 2,238,932 M cubic feet, and that the Corporation Commission, with a view of carrying into effect the gas proration law, made the order requiring the Empire Gas & Fuel Company to connect with the well, already connected with the Natural Gas Corporation line, and take sufficient from it to equalize as between the wells, according to the proration scheme prescribed.

Under proposition 1 it is argued in the brief of the appellants that the Corporation Commission had no jurisdiction to enter the order that was entered, and that under sections 7923 and 7924, C. O. S. 1921, set out in the order, which formed a part of the Session Laws of 1915, the prevention of waste is the main object of the act, and that waste is not here involved, and that on the idea of discrimination that the Corporation Commission could not establish relief as between the two parties brought into the controversy because of a third pipe line in the field, and there was no evidence before the Commission as to the amount of gas being taken by that line, and the point is made that there was no charge of any common purchaser discriminating for or against any person with whom it has a contract, and that section 7935 provides a clear statutory remedy, both civil and criminal, for taking more gas than one is entitled to, which is forbidden by section 7923.

The statement is made, at page 29, as follows:

"* * * It was never the intention of the act that the Corporation Commission should compel the taking of more gas from one well than was being taken already; but only that it should prevent the taking of a greater amount by one person than the law allows, while other persons were remaining within the proper ratable sphere as justified by market demands"

—and argument is made that section 7924, set out in the order, does not apply to the facts in this case.

The statement is made that the Empire Company was taking the gas offered them, and the Oklahoma Natural Gas Corporation was taking gas offered it, each under its contract, the Empire Company paying 8 cents and the other 10 cents per thousand feet, and that the royalty owners, who had made their leases under which the lessee was to find a market for the royalty, as well as for the working interest, could not complain, and that the Commission did not take into consideration and protect the whole common source of supply, but merely forced one company to take gas which had not been offered it for sale, and with which it was not connected until the excessive take was balanced with the adjacent well. It is claimed that under section 7935, the adjacent well owner had a complete remedy, which would determine the excessive takes and protect the adjacent owner, and that the action of the Commission, instead of encouraging proration, encouraged an excessive take.

The further argument is made that the royalty owner could not be the complaining party, and that it was necessary for the complainants to bring themselves within section 7923. The further argument is made that the Commission's order, in effect, creates a contract which is beyond the Commission's power, and in this connection it is stated:

"It is not denied that the Commission has the power under proper circumstances, to abrogate a contract which is in violation of public policy; to modify such a contract; and particularly where rates are concerned, or service, to specify conditions or activities regardless of contract. It is not, however, conceivable that the Commission can in effect create and execute a contract in which the contracting parties are two pipe line companies, two leasing companies and a group of lessors; creating a situation which vitally affects more or less seriously each individual and company involved; and, compels the lion and the lamb to lie down together regardless of the rights or desires of either."

A second proposition urged is that the Commission's jurisdiction, as exercised, in-

fringes upon constitutional rights, and that the right of the Lima Company under its lease, and the Olean Company under its lease, is to sell the gas, and that they had made contracts for its purchase with different companies, and the argument is made that before the gas was produced, the owners of the fee had contracted away the right to sell and dispose of the gas to be discovered, and that the Corporation Commission could not interfere with these contracts by virtue of its regulations, and Adams v. Tanner, 244 U. S. 590, 61 L. Ed. 1336, and Truax v. Corrigan, 257 U. S. 312, 66 L. Ed. 254, 265, and Tyson, etc., v. Banton, 273 U. S. 418, 71 L. Ed. 718, and Missouri v. Public Service Com., 262 U. S. 276, 67 L. Ed. 981, and Wolff Co. v. Court of Industrial Relations, 262 U. S. 522, 67 L. Ed. 1103, are cited, and the deduction is made that the Commission's duty was to see that gas was not wasted, and to see that no common purchaser refused to take gas offered for sale, and this was as far as they could go. Reference is made to the one gas seller selling for 10 cents, and the other one for 8 cents, and contract rights had arisen, and sec. 10, art. I, of the Federal Constitution and sections 7 and 15 of art. II of the State Constitution are cited together with Adkins v. Children's Hospital, 261 U. S. 525, 67 L. Ed. 785, Ribnick v. McBride, 277 U. S. 350, 72 L. Ed. 913, Liggett Co. v. Baldrige 278 U. S. 105, 73 L. Ed. 204, Coppage v. Kansas, 263 U. S. 1, 59 L. Ed. 441, in addition to the cases heretofore named are cited, along with Meyer v. Nebraska, 262 U. S. 390, 67 L. Ed. 1042, and the case of In re Assessment of First Nat. Bank, 58 Okla. 508, 160 P. 469, are cited and quotations are made from some of the cases and comment made thereon. Quotation is made from Wolff Packing Co. v. Court of Industrial Relations, 69 L. Ed. 785, specially holding that a Kansas law allowing an administrative board to fix the hours of labor in industries relating to food, clothing, and fuel, whenever a controversy arises between the employers and employees, was unconstitutional.

The third proposition is that the evidence is wholly insufficient to justify the Commission's order, and complaint is made of the fact that the order was leveled against the Empire Gas & Fuel Company instead of the Cities Service.

The fourth proposition is that the order is vague, indefinite, uncertain, ambiguous, and not susceptible of uniform interpretation. Complaint is made of that portion of the order which directs the Empire Company:

"To take therefrom the amount of gas sufficient to equalize that proportionate and ratable taking of natural gas from said well as will result in the ratable taking of gas therefrom as compared with the taking of natural gas by said Empire Gas & Fuel Company from offsetting wells."

At page 43 is the following:

"We concede that the Commission intended that the Empire Company should diminish the takes from offsetting wells by taking that amount of gas from Shannon No. 1 sufficient to equalize the small amount taken by the Oklahoma Natural with the larger amount taken from the adjacent wells by the Empire. But there is no fixed standard upon which the Oklahoma Natural may act; nor upon which the Oklahoma Natural from this particular well on a given date be unusually large, the Empire must, accordingly, reduce its take, or find itself in exactly the same position with respect to the present orders of the Commission as it was with respect to the well owners prior to the entry of the order; that is to say, the take from Shannon No. 1 would be excessive."

Subdivision C under this is that if the Empire Company should attempt to obey the order of the Commission, it would have to do so at the expense of other sellers in the field, and that each cubic foot taken from the Shannon to supply its market must result in a reduction of the takes not only from the Benjamin wells, but from any other wells to which it may be connected in the same field. Subdivision D is that the order takes no account of any other wells in the field, and makes no uniform ruling except as to the ones specifically involved. Other subdivisions are to the effect that the order takes no account of the distinction between interstate and infrastate markets, and the result of such an order is only to destroy competition in production, and the order invites subsequent, continued, and multiplied litigation at the instance of other well owners drawing from the common source of supply; with the effect that ultimately no contracts whatever could be made and no dependable reservoir of supply created, and that the result in the case of numerous purchasers in a common field would be the wildest criss-cross of pipe lines. Argument is made, based on the variation in demands and the proposition about new gas companies and difficulties arising therefrom, and the determination of the market and total production of the field.

The fifth proposition is that such con-

struction should be made as to avoid unconstitutionality, and Bishop v. Tulsa, 21 Okla. Cr. 457, 209 P. 228 and Rakowski v. Wagoner, 24 Okla. 282, 103 P. 632, and U. S. v. Delaware Co., 53 L. Ed. 836, 213 U. S. 366, are cited. At page 47 it is stated:

"Were the contracts here involved such as affected only public service companies, unquestionably the Commission would have the right to end this contract, in order to preserve the integrity of the business and its ability to proceed."

The Wolff Packing Company Case is again quoted from.

At page 48 of the brief, we find the following:

"As heretofore suggested, the act is aimed at (1) waste, and (2) discrimination. The whole meaning of the act boiled down to a few words is: The natural resources of the state must be conserved; and in the course of conservation no purchaser of natural gas may take more than a fair share ratably of the common source of supply; and no purchaser may refuse to take gas offered for sale or take from one of its producers a greater proportion than from another.

"There is presented here only the question as to the remedy to be applied when one producer, through the medium of a common purchaser with whom it has a contract, is taking more gas than its ratable share, as determined by the market and the total common available supply.

"The answer as to the interpretation and the remedy lie in section 7935. Any person injured by the violation of the inhibition against the taking of more than a fair share, as provided for in section 7923, may bring an action in a court and secure a judgment against the wrongdoer, the person taking more than his fair share for such damages as may have been sustained."

It is further claimed that past damage, the Commission is powerless to adjust, and the conclusion is that if the court construes the act as allowing the party to keep up the discrimination, and having solely a punishment inflicted by fine, then it would be constitutional. But if the court should hold that the Commission was empowered under it to provide a scheme of the enforcement of proration, then it is unconstitutional. It is further insisted that if the constitutional questions are surmounted, the order of the Commission is so vague as to be nonenforceable.

The position taken by the defendant in error, Empire Gas & Fuel Company, is to indorse in its entirety everything that was said in the brief of the Oklahoma Natural Gas Corporation, and to call attention to the fact that the Empire Gas & Fuel Company did not have any pipe lines, and that the one that was connected up was the Cities Service Company. It occurs to us that so far as the order being made against the Empire Gas & Fuel Company, it was merely a clerical mistake, and on suggestion of the mistake it could be corrected by the Corporation Commission carrying out its administrative functions committed to it by the laws of the state.

The answer brief of the royalty owners recites their complaint to the Corporation Commission, and the prayer for the connection with the view of equalizing the amount of gas taken from the land in proportion to the potential of the wells, as contrasted with the adjoining or offsetting wells. The contention is made that the royalty owners have a right to be considered, notwithstanding their lease contracts, and the authorities cited are Munn v. People of Illinois, 94 U. S. 113, which appears to be one of the parent cases on the subject of private property being impressed with certain burdens by reason of being used by its owner for public patronage.

Stress is laid upon the fact that the Oklahoma Natural Gas Corporation is a public utility, and is subject to the regulation of the Corporation Commission, and the case of Minn. & St. L. Ry. Co. v. Minn. er rel. Ry. & W. Com., 186 U. S. 257, is cited and the first syllabus quoted therefrom. An Indiana case (Indiana Gas Co. v. State, 158 Ind. 519) requiring a public utility to serve all inhabitants without discrimination, and Adkins v. Children's Hosp., 261 U. S. 525, as to the freedom of contract not being absolute, is cited, and that owing to the nature of natural gas it is subject to regulation, and the difficulty in getting an adequate remedy is stressed, and the Wolff Packing Co. v. State of Kansas, 262 U. S. 522, 43 Sup. Ct. Rep. 630, case is cited, and the argument is made that the conclusion reached must be by analogy, and the contention is made that if the taking of the natural gas was not regulated, it would be in the hands of certain individuals to practically control the situation. Some public utility cases are cited, and the argument is made that contract would not prevent regulation and a quotation is taken from the contract of the Oklahoma Natural Gas Corporation wherein it agreed to receive, in the usual conduct of its business, all the marketable gas in its natural state produced. A quotation is taken from the contract itself, as follows:

"The contract is subject to all previous or future orders, rules and regulations of the Corporation Commission of the state of

Oklahoma applicable thereto or affecting the same."

Some cases are cited to the effect that the Supreme Court will not pass upon the constitutionality of an act, unless an interested party will be affected thereby, as well as some cases as to the duty of the court to maintain the constitutionality of an act where possible, and some comments are made upon the statements of the opponent's brief.

We do not deem it necessary to discuss in detail all of the various pitfalls that have been pictured in the briefs. Suffice it to say that there is some difficulty in working out an exact proration formula so as to prevent discrimination, and that mathematical exactitude cannot in all cases be arrived at in practical application. As applied to natural gas, science has developed so far concerning its origin, and its habitat, and its qualities, that we know it is not only "fugacious" in the earth, but if admitted to the air is volatile and escapes, and at the same time its volume is so great that it is not ordinarily handled in intermediate receptacles, but generally by connection with the natural receptacle in which it was created by the laws of nature wherein it has been trapped.

The Legislature, in the course of the exercise of its police powers, has seen fit to pass the proration law for the purpose, not only of preventing waste, but also undue haste in development and destruction of natural resources that the present generation has a life interest in, remainder to future generations. It, recognizing the nature of gas and its tendency to seek the first opening to release the pressure under which it is confined in the earth, has prescribed a scheme of proration. It may not be exact. in fact, it would be impossible to make it exact, except in theory, and no formula, in view of the variation in the flow, could be fixed by the Legislature except the idea of equality. The Legislature, recognizing the difficulties and the need of administrative action, left it to the Corporation Commission to work out the details and administer the remedy of "proration." The Corporation Commission were the agents selected and empowered to investigate the details and to administer the remedy. However, out of abundance of precaution and recognizing that the Constitution made out of this court a Supreme Court with supervising power in certain cases. an appeal was provided for to this court. But in practical operation we cannot take the place of the Corporation Commission and administer the law. Its details must be worked out by the administrative board, as what was good in proration yesterday is not good to-day. We seriously doubt whether the exigency that existed the day the Corporation Commission put in force this order now exists, and whether the order as then made would fit the situation to-day. However, as the complaining parties have seen fit to give bond and suspend the order, if it be possible for the injured parties to estimate their damages, and present the remedy of such in court, as suggested in the portion of the brief referred to, this case is not entirely moot.

As applied to the proposition of contracts having been made, and therefore the lessees could handle the entire production as they saw fit, we think unquestionably that the proration law must be taken into the account in judging of the contracts, and that whenever the contracts violate the law, the usual rule of a contract being made in violation of a law and subject thereto would apply. We think that these contracts were made entirely subject to the law on the subject of proration that had been theretofore enacted. In fact, such was the understanding of the parties when they made the contracts, and they provided accordingly, as shown by extracts quoted from the contract.

It would be a very efficient scheme to circumvent the proration law for a purchaser of gas operating by pipe line, which it has to have in order to successfully handle gas, to take more gas in one place on a low cost than a rival operating on a higher purchase cost depending on contract, and by a system of reciprocity, allow its competitor in another pool to take more on the cheap rate. Thus it would be to the advantage of the friendly pipe lines, and very much to the disadvantage of the unsuspecting landowner. Hence the necessity for putting somewhere the power to get a check upon this and as far as possible prevent it and equalize.

Evidently the Corporation Commission tried to do this in this particular case, and the bare fact that there was a variation in the price. it seems to us, would not interfere very seriously with the police power of the Legislature, that must exist in all organized societies as the foundation of the social compact itself. So far-reaching does this police power extend that the Supreme Court of the United States, in dealing, not with natural resources, but with money and credits, in a guaranty bank case, Noble State Bank v. Haskell, 219 U. S. 104, 55 L. Ed. 112, uses the following language:

"In answering that question, we must be

cautious about pressing the broad words of the 14th Amendment to a drily logical extreme. Many laws which it would be vain to ask the court to overthrow could be shown, easily enough, to transgress a scholastic interpretation of one or another of the great guaranties in the Bill of Rights. They more or less limit the liberty of the individual, or they diminish property to a certain extent. We have few scientifically certain criteria of legislation, and as it often is difficult to mark the line where what is called the police power of the states is limited by the Constitution of the United States judges should be slow to read into the latter a nolumus mutare as against the lawmaking power. * * *

"It may be said in a general way that the police power extends to all the great public needs. Camfield v. U. S., 167 U. S. 518, 42 L. Ed. 260, 17 Sup. Ct. Rep. 864. It may be put forth in aid of what is sanctioned by usage, or held by the prevailing morality or strong and preponderant opinion to be greatly and immediately necessary to the public welfare. Among matters of that sort probably few would doubt that both usage and preponderant opinion give their sanction to enforcing the primary conditions of successful commerce. One of those conditions at the present time is the possibility of payment by checks drawn against bank deposits, to such an extent do checks replace currency in daily business. If, then, the Legislature of the state thinks that the public welfare requires the measure under consideration, analogy and principle are in favor of the power to enact it. Even the primary object of the required assessment is not a private benefit, as it was in the cases above cited of a ditch for irrigation or a railway to a mine, but it is to make the currency of checks secure, and by the same stroke to make safe the almost compulsory resort of depositors to banks as the only available means for keeping money on hand. The priority of claim given to depositors is incidental to the same object, and is justified in the same way. The power to restrict liberty by fixing a minimum of capital required of those who would engage in banking is not denied. The power to restrict investments to securities regarded as relatively safe seems equally plain. It has been held, we do not doubt rightly, that inspections may be required and the cost thrown on the bank. * * * The power to compel, beforehand, co-operation, and thus, it is believed, to make a failure unlikely and a general panic almost impossible, must be recognized, if government is to do its proper work unless we can say that the means have no reasonable relation to the end. * * * So far is that from being the case that the device is a familiar one. It was adopted by some states the better part of a century ago, and seems never to have been questioned until now."

The principles laid down by Mr. Justice Holmes in that case have not been departed from, and it seems to be the law of the land to-day.

We have examined the cases that have been cited, and we find nothing in them that would seriously conflict with this idea. The proration law, with reference to oil, has recently been before the Supreme Court of the United States, and most of the difficulties that have been suggested here of a legal nature were there disposed of. The practical or working side of it, however, is something that courts cannot deal with very well, and must necessarily be left to the administrative board, and that board must be so empowered that the order of today can be changed tomorrow, with the varying conditions that arise, if it is to be of any value.

We think, therefore, that no hard and fast rule should be laid down by any court for the guidance of an administrative board whose duty will vary from time to time as new exigencies arise, and that the best thing for the people, who are engaged in using our laws for the purpose of doing business and making profits, would be to co-operate with the various boards and commissions provided by law for the purpose. and endeavor to work out plans for proration, and to apply to the Commission for change of orders as new conditions arise, rather than appeals and by hard and fast method of tying up orders while they enjoy the benefits of a violation of them pending appeal.

Practically all the matters involved here have been settled by the Champlin proration case, Champlin Refining Co. v. Corp. Comm. of Okla., recently passed on by the Supreme Court of the United States, 52 S. Ct. 559, 76 L. Ed. 1062, which reviewed the case of Champlin Refining Co. v. Corp. Comm. of the State of Okla., 51 F. (2d) 823. This court has practically passed upon most of the questions involved here in the case of Quinton Relief Oil & Gas Co. v. Corporation Commission, 101 Okla. 164, 224 P. 156, affirming clearly the right to require proration in this kind of case through the medium of orders made by the Corporation Commission. Also, the same doctrine is applied in the case of C. C. Julian Oil & Royalties Co. v. Capshaw, 145 Okla. 237, 292 P. 841.

We do not deem it necessary to go into discussion at this time as to what procedure would be applied to either force specific performance or to recover damages for nonperformance by the companies of the directions of the Corporation Commission. It appears, however, that the appealing company gave a bond to answer in damages, and whether the

Corporation Commission has authority to enforce its orders, either directly or by going into court to do so, or whether the individual injured is permitted by the statute to go into court for his redress, we do not deem it necessary to decide at this time, as the complaining corporations are working under permits and are presumably solvent.

So far as the complaint is made as to the naming of the pipe line company that was taking part of the gas is concerned, an inspection of the record indicates that it was merely a mistaken name, which the Corporation Commission undoubtedly has the power to correct by an ancillary order, it appearing in one place as though it were the Cities Service Company and in the other the Empire Gas & Fuel Company. Evidently they have been merged in some manner.

The action of the Corporation Commission is presumably warranted by the circumstances under which it was made, and we do not find that it exceeded its authority in making the order for the proration of taking, especially in view of the fact that the cases cited above practically cover every substantial phase of this case. We think that the landowner did not surrender his right to complain of a discrimination that might be made by the contract of his lessee, and finding no reason for reversing the order of the Commission, it is accordingly affirmed.

HEFNER, SWINDALL, and ANDREWS, JJ., concur. RILEY and McNEILL, JJ., concur in conclusion. LESTER, C. J., CLARK, V. C. J., and CULLISON, J., absent.